SCHIRRA v. DELAWARE, L. & W. R. CO.

Civ. A. No. 4047.

United States District Court
M. D. Pennsylvania.

April 2, 1952.

Alphonsus L. Casey, Irving L. Epstein, Scranton, Pa., for plaintiff.

Gomer W. Morgan, Edward W. Warren (of O'Malley, Harris, Harris & Warren), Scranton, Pa., for defendant.

WATSON, Chief Judge.

This is an action under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., to recover damages for personal injuries sustained by the plaintiff while employed by the defendant at its Engine House in Scranton, Pennsylvania.

At the trial of the case the defendant filed a motion for a directed verdict at the close of plaintiff's case and once again at the close of defendant's case, both of which motions were denied. The case was submitted to the jury and it returned a verdict in favor of the plaintiff in the sum of $21,-500. Defendant now moves to set aside the verdict and to enter judgment for defendant, and in the alternative for a new trial.

In considering both motions, the Court must view the testimony in the light most favorable to the plaintiff, including every reasonable inference fairly deducible therefrom. Masterson v. Pennsylvania R.

Co., 3 Cir., 1950, 182 F.2d 793; O'Brien v. Public Service Taxi Co., D.C.M.D.Pa.1949, 83 F.Supp. 55. So viewed, the evidence tended to establish the facts as follows:

The plaintiff was employed by the defendant as a machinist, and on October 25, 1950, was engaged with other employees of the defendant in removing Engine 1244 from one of the stalls in the roundhouse where it had been undergoing repairs. The engine was on tracks placed over a pit which ran lengthwise under the engine and between the rails for the length of the train. The pit was about 4½ feet in width and about 3 feet in depth. There was a cross pit, also known as a drop pit, more or less perpendicular to the pit running lengthwise under the engine. The cross pit was 7 feet wide and approximately 80 feet in length and ran underneath the four stalls on which engines were placed for repair.

The No. 3 wheels of Engine 1244, which are toward the rear, had been dropped below the normal level of the rails for repairs and were hanging down into the cross pit. To move the engine out of the stall it was necessary to have the wheels raised and rails placed under the wheels and over the cross pit in order to bridge the gap in the tracks. Inside the cross pit was a drop-table which could be used to accomplish this. The drop-table was about 7 feet wide and 10 feet long, and could be moved up and down under the engine, as well as along the length of the cross pit to the other stalls. On top of the drop-table were rails, and when the table was raised, it being about 4½ feet below the normal level of the rails, the rails on the drop-table filled the gap in the area over the cross pit.

On the evening in question, however, the drop-table could not be elevated because the electric motor used to supply power for it was burned out, and it was therefore necessary to resort to another method to accomplish the same task. Mr. McDermott, the general foreman of the roundhouse, told Mr. Wrabel, the assistant foreman, to "jack the wheel up". About 8:30 P. M., Wrabel went to the plaintiff, who was at that time working on Engine 259, and told him of this and asked the plaintiff, "How do you get about that?" The plaintiff suggested that it could be done by placing a block and jack on the table under the wheel to raise it, and then put in dead rails to bridge the cross pit. Wrabel then told the plaintiff and his two helpers, Yanoski and Joyce, to leave the job they were doing and come over to Engine 1244.

The plaintiff and his two helpers secured blocking and brought it to the engine in a battery truck derrick. Plaintiff placed the chain from the derrick around the block and lowered it down to the drop-table where Wrabel and another employee, Volinsky, placed it under the engine, and on top of another block already there. Plaintiff then lowered the jack to the same two men, who with the aid of the derrick placed it on the block under the axle. The jack was operated by air pressure so the plaintiff next handed the air hose to the men in the cross pit and it was attached to the jack. When the men on the drop-table were ready, plaintiff turned on the air to raise the jack. The jack raised the wheels but they immediately dropped down again. Plaintiff went under the engine and found that a piece of soft wood 7 x 10 x 14 placed under the jack had been crushed from the weight of the wheel, which weighed about 6 or 7 tons. With the aid of the chain hook from the derrick, the jack was rolled on the table and the crushed block was removed. Plaintiff and one of his helpers got a new block of wood 12 x 12 x 3 and lowered it down to Wrabel and Volinsky who put it in place on top of another block. The chain hook from the derrick was again lowered into the cross pit by the plaintiff; Wrabel, Volinsky and another machinist, Macindoe, set the jack on the block. Plaintiff then went down into the cross pit again and under the engine, where he found Volinsky holding the jack with one hand. Plaintiff gave him a hand, and the block was wobbling. There was a space of about 8 inches between the top of the jack and the binder, and Wrabel said, "We ought to have more blocking, something else on top of the jack". Plaintiff then asked the workers, "Anything out there, any heavy blocking out there?" One of the workers handed plaintiff a steel knuckle pin, 4 to 5 inches in diameter and 8 inches long and weighing about 25 pounds.

Plaintiff handed the knuckle pin to Wrabel, who replied, "That will do" and placed it on the jack. Plaintiff then suggested they put some waste above and below the knuckle pin to prevent slipping.

We now approach the nub of the case on the question of negligence. Plaintiff then suggested to Wrabel, the assistant foreman, "We better level this blocking". It appears that the jack was resting on the 12 x 12 x 3 block spoken of earlier, which in turn was resting on another "big" block. The 12 x 12 x 3 block was not level on one end, and the jack had to be held to prevent it from falling off. Plaintiff wanted to get some washers to place underneath the end of the jack where it was away from the lower block, but Wrabel said, "That will be all right when the weight is on it". Plaintiff disagreed and said, "It won't be all right when the weight is on it". Wrabel replied, "It will be all right when the weight is on it. We haven't got much time. We want to get the engine out of here tonight". Plaintiff said, "Let us take time and do the job right. It will only take a few minutes. It will be safer. Somebody is liable to get hurt or killed. This is a pair of wheels we are jacking up". Wrabel repeated, "It will be all right when the weight is on it". Plaintiff said, "O. K. you are the boss. Jack it up".

The jack started to go up and the blocking where it was not level moved up somewhat. After the wheel moved up part way, plaintiff said. "Hold it", and Wrabel wanted to know what was the matter. Plaintiff said, "We have no blocking here to block under those boxes". Apparently blocking had to be placed between the journal and the binder in order to hold the weight of the journal and the wheel once the wheel was raised. Plaintiff and Joyce left the cross pit to secure the blocking and returned in about ten minutes. Plaintiff got under the engine again and placed blocking under the boxes on both sides of the journal. Plaintiff then said, "O. K., jack it up. I am ready". When the wheels were raised to the full height, they were stopped and plaintiff placed more blocking in on top of the binder and underneath the box on the back

end of the journal, and Wrabel did the same on the front end of the journal.

When the blocking was in, plaintiff started to get out from under the engine and was hit. He stated, "It sounded like a big explosion-bung. That was all I know". The knuckle pin on top of the jack had slipped out of position and struck the plaintiff in the head with great force and causing serious injuries. At the time the knuckle pin came out of position it was on the jack at a point about 5 to 6 feet above the surface of the table. After the accident it was picked up from the drop-table about 2 feet away from the base of the jack.

## Motion to Set Aside the Verdict and Enter Judgment for Defendant.

The defendant contends:

I. *There was no evidence of negligence on the part of the defendant.*

██ Defendant first states that there was no direct evidence of the cause of plaintiff's injury, because there is no direct evidence of what caused the knuckle pin to slip out. This Court, however, feels that there was substantial evidence from which the jury could have and must have inferred that the knuckle pin slipped out of position because of the failure to level the blocking, as plaintiff had requested, before raising the jack. Such an inference was a reasonable one and not one of mere conjecture.

██ Defendant next contends that even if it is conceded that the failure to level the blocking caused the knuckle pin to slip out of position, this still does not establish any negligence on the part of the defendant, because the plaintiff's conduct was the sole proximate cause of the accident in that plaintiff gave the orders to raise the jack. Defendant points out that plaintiff was fully aware of the danger, he argued with Wrabel as to the need for more blocking, and yet the plaintiff gave the orders to raise the jack, stop it, and raise it again. Defendant reasons that plaintiff therefore created the danger by giving the orders to raise the jack. It was not the raising of the jack which created the danger, but rather the failure to properly level the

blocking as plaintiff himself had requested Wrabel to do. Wrabel insisted there was no need to do so as it would be all right when the weight is on it; plaintiff did not think it would be all right and said, "Let us take time and do the job right. It will only take a few minutes. It will be safer. Somebody is liable to get hurt or killed. This is a pair of wheels we are jacking up". That plaintiff's apprehension was well founded is evident from the results.

II. *The plaintiff cannot shift the responsibility for his injury to the defendant by saying that he was directed to give the orders to raise the jack.*

■ As an adjunct to its contention that it was plaintiff's own conduct which was the sole proximate cause of the accident, in that plaintiff gave the orders to raise the jack, defendant states that plaintiff cannot attempt to avoid the consequences of his conduct in giving the orders by saying that he was following the orders and directions of Wrabel, the assistant foreman. The Court repeats its position taken above that it was not the raising of the jack which created the danger, but rather the failure to properly level the blocking. Furthermore, the Court cannot agree with defendant's contention that Wrabel surrendered all his authority as assistant foreman to the plaintiff and that plaintiff was really the boss. Wrabel by his own testimony admitted that he was the boss at that time. His refusal to level the blocking, as requested by the plaintiff, also is evidence of the fact that he did not surrender his authority to the plaintiff in this particular task. Defendant's argument also ignores reality. Though an employee may take the initiative on a job, nevertheless, the final decision or approval rests with his superior. The fact that plaintiff had more experience as a machinist than the assistant foreman did not endow him with greater authority than that possessed by the assistant foreman. It would be improper, to say the least, to require an employee who is more experienced than his superior to assume the responsibility for any work which is deficient, but reward his superior for that which is proficient. The respon-

sibility for directing and supervising the performance of the work rested with Wrabel, the assistant foreman, and the plaintiff was at that time working under the direction and subject to the orders of Wrabel.

III. *The plaintiff acted voluntarily.*

Defendant states that even if it should be conceded that the foreman was in charge of the work and that plaintiff was working under his direction and supervision, there is still no liability upon the part of the defendant because the plaintiff acted voluntarily, i. e., he was fully aware of the danger before he gave orders to raise the jack and was free to act as he saw fit.

■ The 1939 amendment to the Federal Employers' Liability Act, 53 Stat. 1404, 45 U.S.C.A. § 54, provides that an "employee shall not be held to have assumed the risks of his employment in any case where such injury or death resulted in whole or in part from the negligence of any of the officers, agents, or employees of such carrier". Admittedly, the defendant does not say the plaintiff "assumed the risk"; instead, the defendant says the plaintiff acted voluntarily and so the defendant is relieved of any liability. It is evident, however, that defendant is simply charging plaintiff with assumption of the risk under another name. In Tiller v. Atlantic Coast Line Railroad Co., 1942, 318 U.S. 54, 63 S.Ct. 444, 446, 87 L.Ed. 610, the Supreme Court stated: "We hold that every vestige of the doctrine of assumption of risk was obliterated from the law by the 1939 amendment, and that Congress, by abolishing the defense of assumption of risk in that statute, did not mean to leave open the identical defense for the master by changing its name to 'non-negligence.' * * * 'Unless great care be taken, the servant's rights will be sacrificed by simply charging him with assumption of the risk under another name;' and no such result can be permitted here."

Even before the 1939 amendment took effect, the Supreme Court in Blair v. Baltimore & Ohio Railroad Co., 1945, 323 U.S. 600, 65 S.Ct. 545, 89 L.Ed. 490, announced that an employee does not have a duty to quit his job rather than to do something

which he knows or ought to know is dangerous, which in effect is what defendant is now saying the plaintiff should have done. In the Blair case the plaintiff's duties were to unload freight, and in the particular instance he complained to his superior that the pipes he was called upon to unload were too heavy for him and the employees assigned to assist him; instead, he suggested that the car be sent directly to the consignee for unloading with special equipment. His suggestions were refused and he was ordered back to work and in the course of which he was injured. The Supreme Court of Pennsylvania thought plaintiff should not recover because he had assumed the risk of this danger. 349 Pa. 436, 37 A.2d 736. The Supreme Court of the United States took the opposite view and stated, "It is true that the petitioner undertook to do the work after he had complained to the company that the pipe should not be moved in the manner it was. But he was commanded to go ahead by his superior. Under these circumstances it cannot be held as a matter of law that he voluntarily assumed all the risks of injury." [323 U.S. 600, 65 S.Ct. 548.]

■ In the instant case, though there was no testimony of an express command by Wrabel to the plaintiff to continue on the job despite plaintiff's apprehension of the danger involved, nevertheless, the plaintiff could reasonably infer the same from the position of the parties and the circumstances involved, particularly in view of Wrabel's statement, "It will ·be all right when the weight is on it. We haven't got much time. We want to get the engine out of here tonight".

IV. *Plaintiff's return to the danger after having escaped was a second and separate proximate cause of his injury.*

Defendant also maintains that when plaintiff left the scene for approximately 10 minutes to secure some blocking, the chain of events leading up to whatever caused his injury was broken, that he was then out of danger, and that plaintiff would never have been injured had he not returned to the dangerous set up.

■ If the negligence existed originally, and this Court believes there was substantial evidence from which the jury could find that fact, it continued to exist up until the time the unfortunate accident occurred. Plaintiff's return to the scene cannot be said to have been a superseding cause. Defendant here, too, cannot be heard to say that plaintiff voluntarily assumed the risk by returning to the job, for it was his implied duty to return to his job. As stated earlier, an employee need not quit his job rather than to do something which he knows or ought to know is dangerous.

■ Defendant also relies on the general rule of law set forth in Hall v. Ziegler, 1949, 361 Pa. 228, 64 A.2d 767, 768, to the effect that "where a person chooses a place of danger in preference to one of comparative safety, and by reason of his position is injured, his own act in placing himself in such dangerous position amounts to an assumption of the risk and he cannot recover". The above case, and others in which the rule has been applied, may be distinguished from the instant case by the presence here of the master-servant relationship and the duties and responsibilities accompanying the same. Furthermore, as pointed out earlier, the 1939 amendment abolished the defense of assumption of risk in actions brought under the Federal Employers' Liability Act.

Defendant's motion to set aside the verdict and enter judgment for defendant must be denied.

### Motion for New Trial.

Defendant contends:

I. *The verdict is against the weight of the evidence.*

In addition to reasons set forth by the defendant in its motion to set aside the verdict, defendant states that plaintiff's testimony was not corroborated by fellow employees, that it was contradicted by Wrabel, the assistant foreman, and that plaintiff's testimony is incredible, and therefore against the weight of the evidence.

■ Plaintiff's testimony as to the blocking not being level was corroborated

to some extent by Stanley Yanoski, a machinist's helper and co-worker of the plaintiff, when he testified that Schirra said, "make sure that everything is level, and Wrabel said everything is all right as soon as we get a little pressure". It is also well established that a plaintiff's testimony need not be corroborated when it is sufficient by and of itself to establish negligence. Caros v. Johnston, D.C.W.D.Pa.1943, 51 F.Supp. 75. If the jury believed plaintiff's testimony, there was sufficient evidence from which they could infer that defendant was negligent.

■ The fact that the evidence was sharply in conflict is no ground for a new trial. The credibility of the witnesses is for the jury, and where there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion, and it is immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable. Lavender v. Kurn, 327 U.S. 645, 653, 66 S. Ct. 740, 90 L.Ed. 916.

II. *The issue was not clarified for the jury.*

■ The defendant maintains that the Court's charge with respect to the negligence of the defendant was general and abstract. After reviewing the charge on the question of negligence, the Court feels that the question was adequately covered and the issue was clearly presented to the jury. The Court explained the nature of the case, the pertinent sections of the Federal Employers' Liability Act as to the liability of a railroad for injuries to its employees resulting from the railroad's negligence, and that the burden of proof was upon the plaintiff to establish negligence and to show that such negligence was the proximate cause of the accident. The employer's liability under the Act is to be determined by the general rule which defines negligence as the lack of due care under the circumstances; or the failure to do what a reasonable and prudent man would ordinarily have done under the circumstances of the situation; or doing what such a person under the existing circumstances would not have done. Tiller v. Atlantic Coast Line Railroad Co., 318 U.S. 54, 67, 63 S.Ct. 444, 87 L.Ed. 610, supra. During the course of the charge, the Court explained this to the jury not once but three times.

In its charge, the Court also stated, "As I understand it, and it appears to me, the gist of the negligence alleged by the plaintiff is that certain blocking under a jack which was used to raise a set of engine wheels was improperly secured or was not properly leveled by the defendant's employees before it was used to raise a set of engine wheels. If you find that these facts as alleged by the plaintiff are true you must then determine whether such conduct on the part of the defendant or its employees was negligent conduct. * * * And the contention of the defendant, as I understand it, is that defendant was in no way negligent, that it exercised due care, and that on the contrary if anyone was negligent at all it was the plaintiff himself".

The Court feels that the jury had adequate guide posts to direct it in its deliberations on the question of negligence, and that the Court need not have commented any further than it had on the facts of the case.

■ Defendant's next point is that the statement of plaintiff's contention was misleading as the Court implied that the plaintiff could recover if defendant's employees used a jack to raise a set of engine wheels without properly leveling the blocking which was under the jack. The Court very clearly stated, "If you find that these facts as alleged by the plaintiff are true (that the blocking was improperly secured or not properly leveled) *you must then determine whether such conduct on the part of the defendant or its employees was negligent conduct*". The Court feels that its statement was not misleading, nor subject to the interpretation placed upon it by defendant.

■ Defendant also states that the Court's charge was inadequate because the Court refused to instruct the jury as requested by the defendant at the close of the Court's charge. Defendant's request was, "The Court is requested to charge the jury on the issue raised by the defendant's contention that under the evi-

dence in this case Mr. Schirra and not Mr. Wrabel was supervising, directing, and in charge of this work, and that if the jury find that this is so, namely, that Mr. Schirra was in charge of the work then the alleged negligence of the defendant would not be the proximate cause of the injury". Earlier in this opinion, the Court has very thoroughly gone into the question of the supervisor-employee position of Wrabel and the plaintiff on this job, and concluded, as it did at the time of the trial, that there was no evidence in the case to support defendant's contention that the plaintiff was the boss on the job. Wrabel, the assistant foreman, admitted that he and not the plaintiff was the boss. To have instructed the jury as requested by the defendant, or in its material substance, would have been error.

III. *The Court erred in charging the jury with regard to the measure of damages.*

Defendant submits that the Court erred in charging the jury as to pain and suffering. The Court stated,

"There is something else you must take into consideration in order that the plaintiff may be fairly and fully compensated for the injuries sustained, and that is pain and suffering * * *."

"You can take into consideration, and you should take into consideration the fact that his future life may be more or less annoyed, his happiness and enjoyment interfered with by reason of the physical condition which prevents those enjoyments that people in good health are accustomed to have and ordinarily do have * * *."

Defendant is of the opinion that annoyance and interference with plaintiff's happiness and enjoyment are not elements for which he was entitled to be compensated in damages, and by use of the terms the Court improperly enlarged the scope of the element of damages known as pain and suffering.

In Bostwick v. Pittsburgh Rys. Co., 1917, 255 Pa. 387, 100 A. 123, 124, the Supreme Court of Pennsylvania held that "the jury should add for that element of damage such reasonable sum as they find from all the evidence and circumstances will fairly com-

pensate plaintiff for the pain, suffering, and inconvenience he has and will endure as a result of his injuries." Also in Baker v. Irish, 1896, 172 Pa. 528, 33 A. 558, 559, the Supreme Court of Pennsylvania found no error in the lower court's charge, reading as follows, "He may recover for privation and inconvenience he has been subjected to, and for the pain and suffering he has already endured, bodily and mentally, and which he is likely to endure." This Court elaborated somewhat on what constitutes "inconvenience" to the plaintiff, but by so doing did not improperly enlarge the scope of the element of damages known as pain and suffering.

In any event, defendant failed to object to that portion of the charge before the jury retired and is therefore no ground for granting a new trial. Rule 51 of the Federal Rules of Civil Procedure, 28 U.S.C.; Chlipala et ux. v. A. A. Morrison & Co., Inc., D.C.M.D.Pa.1942, 44 F.Supp. 894.

IV. *The verdict of $21,500 was excessive and out of proportion to the plaintiff's injuries.*

Up to the time of the trial, plaintiff had not returned to work and had lost approximately $3900 in wages. It was reasonable for the jury to conclude from the evidence that the plaintiff was unable to return to his former occupation or to any gainful occupation during that period, despite the testimony of defendant's doctor that he had ordered plaintiff back to work on January 18, 1951.

Plaintiff also incurred a medical expense of $335 as a result of the injuries, and his dentist estimated his bill for treating abscessed and broken teeth, which he believed were caused by the accident, at $286. Plaintiff had therefore shown special damages in the sum of $621 for medical and dental expenses and approximately $3900 in lost wages to the date of trial, or a total of $4521.

The jury must have awarded the balance of the verdict, approximately $17,000, to the plaintiff for his pain and suffering and for future loss of earnings. Whether or not this amount is excessive will depend

upon the extent of the injuries suffered by the plaintiff.

After the accident occurred, the plaintiff testified that everything went black and that the next thing he remembered was that he was at the Moses Taylor Hospital. The records of the hospital show that plaintiff suffered three lacerations of the scalp, which were cleaned and sutured. X-rays revealed no fracture of the skull, and plaintiff was discharged from the hospital in a week. He continued to call at the dispensary weekly for several months. Dr. MacLean, the chief surgeon at the hospital, and who was employed directly or indirectly by the defendant railroad, ordered plaintiff back to work on January 18, 1951, which was almost three months after the accident, but plaintiff refused to return to work. He testified that he had frequent dizzy spells, severe headaches and soreness, all of which was aggravated when he stooped or bent down. Plaintiff also complained of sleepless nights and loss of appetite. He said he refused to return to work because he was unable to do any work. He attempted to do work about the house, but found his condition became worse and therefore ceased his efforts.

Plaintiff has three scars on his forehead, the largest of which appears on the left side of his forehead and is from six to eight inches in length. Plaintiff has continued to secure medical treatment from Dr. Killeen about twice a week to help relieve him of the pain in his head.

The medical testimony offered in the case conflicted sharply as to the presence of brain injury. Dr. Garvey examined the plaintiff a few days prior to trial and his diagnosis was that plaintiff suffered a concussion of the brain and had either some small hemorrhages or a laceration of the brain, and further stated that to have symptoms continue as they are, plaintiff must have some scar tissue in his brain. Dr. Killeen, who treated plaintiff since February 9, 1951, diagnosed plaintiff's condition as a severe degree of concussion of the brain and that plaintiff's condition is progressively getting worse. It was his opinion that plaintiff, at the time of the trial, was unfit to follow any gainful occupation, and if plaintiff's condition continues as it has in the past six months, that he will never be able to work again.

The doctors called by the defendant expressed entirely different opinions. Dr. Corcoran took X-rays of the plaintiff and found no fracture of the skull, and expressed the opinion that there was no damage to the brain. Dr. MacLean and Dr. O'Malley said that inasmuch as the X-rays were negative as to any damage to the skull, there could have been no brain injury unless the plaintiff was unconscious after the accident or showed other symptoms indicative of injury to the brain. They contended plaintiff was not unconscious after the accident as he walked with the assistance of two of his fellow employees from the scene of the accident and gave one of the employees the keys to his locker. Plaintiff contended that everything went black after the accident and the next thing he remembered was that he was at the hospital.

The Court, being aware of this sharp conflict in the medical testimony, stated to the jury: "There are important facts in this case that are very much in dispute, not only as to the accident itself but as to the extent of the injuries to the plaintiff. How are you going to determine the truth here? That is your duty and that is what you must do here. The credibility of a witness is for you—all for you, and it is for you to say whether you believe a witness or you do not. You are the judges of the credibility of the witnesses and the weight that should be given their testimony. With that the Court has nothing to do. You may judge the credibility of a witness by the manner in which he gives his testimony, his demeanor upon the stand, the reasonableness or the unreasonableness of his testimony, his means of knowledge as to any fact about which he testifies, and his interest in the case, or any circumstances tending to shed light upon the truth or falsity of such testimony and it is for you at last to say what weight you will give to the testimony of any and all witnesses".

The Court feels that its charge on the credibility of witnesses applied to

the expert as well as the lay witnesses, and was proper and adequate. It was then the jury's function to credit or discredit all or part of the testimony. Moore v. Chesapeake & Ohio Railway Co., 1951, 340 U.S. 573, 576, 71 S.Ct. 428, 95 L.Ed. 547.

 In view of the serious injury to plaintiff's head, the jury would be justified in awarding plaintiff a substantial sum of money to fairly compensate him for past and future pain, suffering and inconvenience, and the amount to be awarded is peculiarly within the discretion of the jury, provided it is within reason. The sum of money a jury awards for pain and suffering also need not be reduced to its present worth. Yost v. West Penn Rys. Co., 1939, 336 Pa. 407, 9 A.2d 368. As was stated by Judge Goodrich in Scott v. Baltimore & O. R. Co., 3 Cir., 1945, 151 F.2d 61, at page 64, "Insofar as the award of damages to him consists of compensation for pain and suffering it is, obviously, nothing that an appellate court can, or a trial court for that matter, measure by a yardstick as to whether the jury has given too much or too little."

The final element of damages which the jury had to consider was plaintiff's loss of future earnings. There was evidence from which the jury might have found that this man would not be able to follow a gainful occupation. Prior to the accident, plaintiff was in good health and earning approximately $3,900 a year. At the time of the trial he was 55 years of age and a man of that age has a life expectancy of 17.40 years according to the mortality tables in evidence. Even if we were to assume that the jury awarded plaintiff nothing for pain and suffering, which is highly improbable, and awarded plaintiff all of the $17,000 for loss of future earnings, in the light of the evidence, it would not be so excessive as to shock the conscience. Assuming the plaintiff would have worked only until the age of 65, the usual retirement age for men in manual occupations,

if he were to continue to receive his present annual wage, he would lose approximately $39,000 in future wages, which reduced to its present worth would still exceed $17,000.[1] Furthermore, the Court has no way of knowing how much of this $17,000 was awarded to the plaintiff for his pain and suffering.

 There is no precise rule for translating injury into money. The most a court can do is to properly instruct the jury as to the elements of damage a plaintiff may recover for in a personal injury action, and, on a motion for a new trial, to examine the whole case on the law and the evidence with a view to securing a result which is legal and just. William B. Smith v. The Times Publishing Company, 1896, 178 Pa. 481, 501, 36 A. 296, 35 L.R.A. 819. This Court, as a trier of fact, if it had found for the plaintiff, might have awarded a smaller sum than the jury did, but a court should not substitute its judgment for that of the jury. A court should not set aside the jury's verdict on the ground that it is excessive unless it is so high as to shock the conscience, or unless it is evident that the jury was biased or acted capriciously or unreasonably. Foresman v. Pepin, D.C. E.D.Pa.1946, 71 F.Supp. 772, affirmed 3 Cir., 161 F.2d 872. This Court cannot say that the jury's verdict shocks the conscience of the Court, nor does it reflect bias, nor does it indicate that the jury acted in a capricious or unreasonable manner.

 It is idle to compare the size of this verdict with others returned in this Court, in other federal courts, or in the state courts, be they higher or lower, for each case is different on its facts. It is also irrelevant as to what a workman would receive under the Pennsylvania Workmen's Compensation Act 77 P.S. § 1 et seq., for similar injuries, because the Workmen's Compansation Act has set up a schedule of moderate compensation for employees injured during their course of work *irrespec-*

---

1. The present worth of $39,000, due in 10 years at 3% interest compounded annually, which is a reasonable estimate of return today, would amount to $29,-019.66, which exceeds the total amount of the verdict. If the sum of $17,000 were invested at 3% interest compounded annually, in 18 years it would amount to $28,941.86.

*tive of negligence.* In return for the same, the employer has given up defenses available to him in a common law action; whereas, the employee has surrendered the right of action theretofore possessed by him. Gallivan v. Wark Co., 1927, 288 Pa. 443, 448, 136 A. 223. Juries as well as the courts are readily aware of the fact that our cost of living has increased sharply during the last 10 or 15 years,[2] and that our dollar has diminished in value greatly, and the notable increase in the size of jury verdicts in recent years may, to a large extent, be attributed to the same.

V. *The verdict is excessive in the light of the plaintiff's flagrant contributory negligence.*

The question of plaintiff's contributory negligence was one for the jury to decide, and the Court explained the question to the jury fully and clearly, stating: " * * * So if you find that the defendant was negligent from the evidence, and also find that the plaintiff himself was negligent, that does not bar any recovery, but you must find a verdict for the plaintiff in this case. However, there is also another provision in the law, and that is that if you find that plaintiff was contributorily negligent, it will be your duty to decrease the amount of the verdict, that is, the verdict is diminished or reduced by the amount of the negligence attributable to the plaintiff. In that case you will reduce the amount of the verdict in favor of the plaintiff by such a proportion as you would determine his own negligence to have contributed to the happening of the accident".

Later in the charge the Court again stated: " * * * but if you find that the plaintiff was contributorily negligent you would then merely reduce the amount of the verdict by such an amount as you think represents the proportionate share resulting from the plaintiff's own negligence".

There was no objection by the defendant to the Court's charge on contributory negligence, nor any requested modification or amplification of the same. The Court must assume that the jury considered the problem of contributory negligence with all the other aspects of the case. Jones v. Pennsylvania R. Co., D.C. E.D.Pa.,1947, 75 F.Supp. 855, affirmed 3 Cir., 166 F.2d 299.

VI. *The jury was misled by the newspaper publicity.*

There were newspaper articles published during the course of the trial which stated that plaintiff was seeking $75,000 in damages, but the defendant did not call the Court's attention to the same. It is the practice of the newspapers in this city, as well as in most other cities, to quote the amount which plaintiff is seeking to recover in personal injury actions, especially where the amount is large, and if the defendant felt that the jury would be misled by these articles, defendant should have specifically requested the Court to caution the jury about these articles. By failing to object immediately defendant waived his right to object at all. Commonwealth v. Clay, 1914, 56 Pa.Super. 427.

In support of its statement that the jury were misled by the newspaper publicity, counsel for defendant state that they are informed that the jury did not discuss the question of negligence, but merely argued as to how much the plaintiff should receive out of the $75,000 he claimed. One juror suggested one-half of that amount; ultimately they agreed upon $21,-500. It is well established that the verdict of a jury cannot be impeached by the testimony or affidavits of the jurors. McDonald v. Pless, 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300. In Friedman v. Ralph Bros. Inc., 1934, 314 Pa. 247, at page 249, 171 A. 900, at page 901, the Supreme Court of Pennsylvania said: "What is more important, we cannot accept the statement of jurors as to what transpired in the jury room as to the propriety or impropriety of a jury's conduct. * * * To do so would destroy

---

2. The Consumers Price Index, published by the Bureau of Labor Statistics, for February 15, 1952, was 187.9. In other words, the cost of living, as affected by price changes, has increased approximately 87.9% over the 1935–1939 period.

the security of all verdicts and go far toward weakening the efficacy of trial by jury, so well grounded in our system of jurisprudence. Jurors cannot impeach their own verdict. Their deliberations are secret and their inviolability must be closely guarded."

Defendant's motion for new trial must be denied.