Edward F. RODDY, Respondent,

v.

**GENERAL MOTORS CORPORATION,**
Appellant.

No. 50477.

Supreme Court of Missouri,

Division No. 1.

June 8, 1964.

Motion for Rehearing or for Transfer
to Court En Banc Denied
July 13, 1964.

Lyng, Mac Leod, Donnelly & Corcoran, Russell N. Mac Leod, John D. Connaghan, St. Louis, for (plaintiff) respondent.

Chapman, Chapman & Litz, Wilton D. Chapman, Thomas W. Chapman, Arthur Litz, St. Louis, for (defendant) appellant.

COIL, Commissioner.

A jury awarded Edward F. Roddy $18,000 as damages for personal injuries he averred he had received as a result of the alleged negligence of General Motors Corporation. That company has appealed from the ensuing judgment and contends the trial court erred in refusing to direct a verdict for it at the close of all the evidence.

The only witness on the issue of liability (there is no present question concerning the nature and extent of the injuries or the amount of the award) was the plaintiff, who testified in his behalf and was recalled to the stand by the defendant as the only witness in its case. In summarizing plaintiff's testimony we shall put that construction upon it which is favorable to him.

Mr. Roddy was and had been for 25 years a steam fitter. He was employed by the Corrigan Company, a piping contractor. He and a fellow employee, Mr. Moran, had been working at the General Motors plant at Union and Natural Bridge for a month or six weeks. When plaintiff and Moran returned from lunch on March 7, 1956, their job was to remove a pressure-reducing station. A pressure-reducing station consists of pipes, fittings, valves, etc., assembled in a certain way. The purpose of the station was to reduce the 165-pound pressure in the main steam line to a pressure of 50 pounds. Apparently the reason for the pressure reduction at the place in question no longer existed and thus the pressure-reducing apparatus was to be removed. Plaintiff and Moran went to a part of or room in the plant on the second floor where automobile bodies came out of paint ovens on an assembly line and where

General Motors employees would correct any paint flaws. That assembly line was in operation while plaintiff and Moran were working some fifteen feet above.

The main 165-pound line probably ran throughout the entire plant; but in the area in question the pipe (carrying the steam) or the line ran vertically (apparently) through the floor of the room in question and then toward the ceiling for approximately 15 feet. One end of a 4-inch nipple (a short length of pipe not exceeding six inches in length and usually with threads on both ends) had been welded into the main line. About one half the length of that nipple was covered with insulation. The threaded end of the nipple connected with a gate valve (a device to shut off or stop the flow of steam at the point of the valve). Extending vertically out of the top of the gate valve was another nipple probably six inches long attached to the top end of which was a 90-degree elbow (a piece of pipe which changed direction from vertical to horizontal) which in turn continued into the first (a strainer) of the various parts of the apparatus which made up the pressure-reducing station. The area occupied by parts making up the station was about 4 feet long and 1½ feet wide. As assembled it hung from the ceiling on 3/8-inch rods which supported the weight of the assembled pipes and fittings.

In order to disassemble and remove the reducing station it was necessary that plaintiff and Moran stand or crouch upon a "pipe cluster." The "cluster" consisted of 20 or 30 pipelines and conduits for air, steam, and water, and perhaps other purposes, which, as noted, were about 15 feet above the floor of the room in which they were working and above the lights which lighted the room and the assembly line below. Consequently, the area in which they worked was poorly lighted and relatively dark.

Plaintiff testified that he understood there had been some discussion about shutting off the pressure in the main line completely, but that such was not done and consequently he made certain the gate valve was closed, was not leaking, and that no steam was passing beyond it, so that there was no steam in the pipes of the pressure-reducing station while they were working on it.

The various pipes and fittings, etc., which made up the reducing station were removed in sections beginning with the section farthest from the main line. The sections were lowered to the floor by ropes. The last item which was to be removed and thus the item closest to the elbow connecting with the nipple which ran vertically from the gate valve, was a fitting called a strainer. They were adjusting their wrenches preparatory to removing the strainer and were about one or two feet from the gate valve. Possibly they had touched the strainer with their wrenches to determine the degree of adjustment needed so the wrenches would fit the particular pipe, when there was an "explosion." It was later determined that the nipple (heretofore described), with one end welded into the main line and the other attached to the gate valve, blew open and the steam was released with "a roar" and caused plaintiff to fall from the pipe cluster 15 feet to the floor of the room.

Plaintiff was removed to a hospital where at a later date one of his fellow steam fitters showed him the nipple which had been welded into the main line and he observed that the wall of that nipple was "as thin as a piece of paper." He said he did not know what caused the explosion but that he was told while in the hospital that the explosion resulted because the 4-inch nipple that had been welded into the main line did not have enough thickness of wall. He said that it probably would not have broken had it been thicker, and that he knew, after being told, that the wall of the nipple giving way was what caused the steam to be released.

Plaintiff testified that he had nothing to do with the nipple that had been welded into

the main steam line; that he and his fellow workman did not touch it; that none of their work had anything to do with that nipple or with the live steam line; that while there could have been some slight movement of the pipes as they worked, only theoretically could there have been any pressure on the nipple (which gave way) by reason of their disassembling the pipes making up the pressure-reducing station or by reason of their being or moving upon the "pipe cluster."

There was "quite a bit" of work going on at the General Motors plant in 1956, but plaintiff did not know whether what they were doing on March 7 was part of the general renovating and dismantling work that was in progress. He and Moran were told to remove the pressure-reducing station apparently without explanation or further comment.

Defendant admitted that it was the owner of the premises, including all the pipes and fittings that were involved on March 7, 1956.

■■ Defendant contends first that the trial court erred in refusing to direct a verdict for the stated reason that the instrumentality which caused plaintiff's injury was not under defendant's management and control. There is, of course, no doubt that in Missouri the res ipsa loquitur doctrine usually applies only when the occurrence resulting in the injury was such as would not ordinarily happen if those in charge used commensurate care, the instrumentality involved was under the management and control of the defendant, and the defendant possessed superior knowledge or means of information as to the cause of the occurrence. Layton v. Palmer, Mo., 309 S.W.2d 561, 564[2]. It is also well established that "the requirement that the instrumentality be under the management and control of the defendant does not mean, or is not limited to, actual physical control, but refers rather to the right of control at the time" of the occurrence.

McCloskey v. Koplar, 329 Mo. 527, 46 S.W. 2d 557, 560.

■ A review of plaintiff's total testimony, from a standpoint favorable to him, reasonably requires the conclusion that defendant by reason of the ownership of the premises and of the pipes and fittings involved, including the live main steam line and the nipple, the wall of which gave way, had the management and control of the instrumentality involved. We point out that there was no evidence as to what the relationship was between defendant and the Corrigan Company. Thus there was no showing that defendant-owner did not retain the right and power to direct the manner of doing the work or retain the right to control the Corrigan Company in the performance of the work. Cf. Martin v. First National of Independence Co., Mo., 372 S.W.2d 919, 923[1].

The cases from other jurisdictions cited and relied upon by defendant for the proposition that there is no liability where one is injured by reason of defective machinery operated by or under the partial control of the injured plaintiff are not, even if otherwise sound, applicable here because there is no evidence in this case to show (the evidence was all to the contrary) that plaintiff or Moran were working on the main steam line, a part of which proved to be defective.

Clearly, the instrumentality which caused injury to plaintiff was under the control of the defendant within the meaning of the "control and management" condition prerequisite to the application of the res ipsa doctrine.

■ Defendant contends further that the trial court should have sustained its motion for a directed verdict because plaintiff showed the specific cause of his injury and thus was precluded from a res ipsa submission. Defendant filed a motion for a directed verdict at the close of the evidence, an after-judgment motion to set aside the verdict and judgment and enter judgment for it in accordance with its motion filed at the close of the evidence, and an alterna-

tive motion for new trial. We have examined those motions and we do not find in any of them an assignment that plaintiff was precluded from a res ipsa submission because he had proved specific negligence. Inasmuch as the allegation of error now urged was not presented to the trial court in any post-trial motion, the question has not been preserved for appellate review. Civil Rule 79.03; Gosnell v. Gosnell, Mo. App., 329 S.W.2d 230, 234[5–7].

■ In any event, it is clear that even assuming plaintiff proved that the rupture of the nipple in question caused the steam to escape and plaintiff's subsequent injury, plaintiff did not prove the specific negligence which caused the injury. Questions such as whether it was negligence to have installed a nipple, the gauge (i. e., the thickness of the wall) of which was too thin, or whether it had become too thin due to a subsequent cause such as defendant's negligence in failing to properly maintain the line, or whether defendant negligently failed to properly inspect the line and its component parts, or whether the nipple gave way for other conceivable negligence, were not answered by the evidence. The specific reason for the failure of the wall of the nipple and the escape of the steam was peculiarly within the knowledge of the defendant, who offered no evidence on the subject.

We are of the view that plaintiff's evidence did not show the specific negligence which caused the injury and thus that plaintiff was not precluded from a res ipsa submission. Stevens v. Missouri Pacific R.R. Co., Mo., 355 S.W.2d 122, 130; Williams v. St. Louis Public Service Co., 363 Mo. 625, 253 S.W.2d 97, 101[7].

Defendant stated in oral argument that it was not "pressing" the other reasons set forth in its brief in support of the contention that the trial court erred in failing to direct a verdict for it at the close of the evidence. Inasmuch, however, as defendant did not specifically abandon the points, we shall briefly note them.

■ It is contended that plaintiff was an employee of an independent contractor. We have heretofore noted that there was no substantial evidence showing the relationship between defendant and the Corrigan Company and thus there was no evidence to establish that plaintiff was the employee of an independent contractor.

■ It is urged that plaintiff was contributorily negligent. In that respect, we note that although defendant pleaded plaintiff's negligence, it did not submit that issue. Furthermore, the only new-trial assignment with respect to contributory negligence was that plaintiff's verdict-directing instruction did not require a jury finding negativing contributory negligence on plaintiff's part. When defendant failed to submit the affirmative defense of contributory negligence, he abandoned that defense and it no longer remained an issue for any purpose. Shepard v. Harris, Mo., 329 S.W.2d 1, 7, 8.

■ It may be that defendant may nevertheless properly urge on this appeal that plaintiff was contributorily negligent as a matter of law. The facts heretofore reviewed refute without further discussion or demonstration that even if there was sufficient evidence to have made a jury issue as to plaintiff's negligence, we correctly may not hold that plaintiff was contributorily negligent as a matter of law.

■ Defendant finally suggests that there were two equally established reasons for plaintiff's injury and that inasmuch as defendant was responsible for only one, plaintiff was not entitled to recover. The difficulty with that contention is that only by speculation and conjecture may it be said, as defendant contends, that anything plaintiff or his fellow worker did while removing the pressure-reducing station "put too much pressure on the nipple" or "violently or abruptly exerted" any "force * * * against it" or that plaintiff or Moran did anything else which proximately caused or contributed to cause the wall of

the nipple in the main steam line to give way and injure plaintiff. Defendant's theory in that respect was not supported by substantial evidence; but in any event it was sufficient for plaintiff's submissible case that there was substantial evidence supporting a reasonable inference that plaintiff's injury resulted from defendant's negligence. The fact that the nipple may have ruptured for a reason for which defendant was not liable, did not preclude plaintiff from submitting to the jury the question whether some negligence of defendant caused or contributed to cause the nipple wall to rupture. Leisure v. J. A. Bruening Co., Mo., 315 S.W.2d 705, 708[5, 6] [7].

The judgment is affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur except HENLEY, J., not sitting.