Walter ANDERSON, Original Plaintiff, Oliver F. Erbs, Executor Estate of Walter Anderson, Deceased, Later Substituted as Party Plaintiff, Respondent,

v.

ORSCHELN BROS. TRUCK LINES, INC., Appellant.

No. 50880.

Supreme Court of Missouri,

Division No. 1.

July 12, 1965.

Motions for Rehearing and to Transfer to Court En Banc Denied Sept. 13, 1965.

Jerome M. Steiner, Clayton, and Oliver F. Erbs, Kirkwood, John S. Marsalek, St. Louis, of counsel, for plaintiff-respondent.

Chapman, Chapman & Litz, Wilton D. Chapman, Thomas W. Chapman, Arthur Litz, St. Louis, for defendant-appellant.

HOUSER, Commissioner.

This is a damage suit for personal injuries sustained by Walter Anderson at the freight station of Orscheln Bros. Truck Lines, Inc., in St. Louis. Submitted on the theory of res ipsa loquitur, there was a jury verdict for plaintiff for $95,000. The truck line has appealed from the judgment entered upon the verdict. We have jurisdiction because the amount involved is in excess of $15,000.

Defendant's first point on appeal is that Anderson failed to prove (a) that he was injured by an instrumentality in the exclusive control of defendant and (b) that defendant was in a superior position to know what caused the instrumentality to fall. This requires a statement of the evidence, which we relate in a manner favorable to Anderson, the prevailing party, accepting the evidence in his favor as true and rejecting all contrary evidence and inferences.

Anderson was seriously injured while attempting to climb up onto the platform of the dock to unload his employer's trailer. A 150-pound steel cylindrical tank 4 or 5 feet long, 8 or 9 inches in diameter, fell in his direction, causing him to release his hold as he was ascending and to fall backwards onto the ground, where the tank struck Anderson's body.

Defendant's freight station consists of a warehouse and dock 200 to 300 feet long, extending north and south on 14th Street. The accident occurred on the west side of the dock. Along that side there are 14 doors, each 10–12 feet wide. Near the edge of the platform or floor of the dock there are a number of upright steel U-beams or posts. Some support the roof. Others serve as channels for the doors. The dock platform is approximately 49 inches higher than the surrounding areaway, on which tractor-trailer units drive in delivering merchandise to the freight station. This areaway is part of defendant's premises. Along the main aisle of the dock, 10 or 12 feet back from the doors, defendant's employees move freight from one trailer to another. On the dock for use in unloading trailers defendant provides various kinds of equipment: hand trucks, wheel trucks, fork lifters, and cylindrical "oxygen" tanks such as the one that injured Anderson. These cylinders, which are used by defendant because of their greater strength, are placed under unusually heavy objects and used as rollers in bringing heavy, bulky merchandise from the trailers into the warehouse. Ordinary pipe would collapse under heavy loads; a small roller does not roll as readily as a large one in moving heavy objects. The cylinder in question was lo-

cated and kept around the area of doors 11 and 12. At this particular location defendant transferred heavy objects, loads of steel, etc., because the terrain and height of the dock platform were more favorable. In moving heavy objects it is important not to have any "rise" between the dock and the trailer.

When a tractor-trailer operator comes onto the premises to deliver merchandise he parks, goes to defendant's office, which is located at the north end of the dock. There he gets his tickets or invoices checked; gets "his bills okayed." Then he backs his trailer in to an open dock, unloads, has one of defendant's checkers count the packages or merchandise delivered and check the merchandise for damage, sign the ticket. Defendant's receiving clerk then issues him a receipt. Defendant would not "accept anything from anybody without that bill having been okayed by the freight clerk."

When necessary to unload an object of great weight the trucker asks defendant's employees to bring a cylinder. Defendant's employee then goes and gets the necessary cylinders, brings them out for use and places them in position under the heavy object. Defendant's employees and the tractor-trailer operator, working together, then roll the heavy object from the trailer into the warehouse. Sometimes the merchandise is left standing on the tanks for later transfer from warehouse to trailer. At other times the cylinders are withdrawn by defendant's employees and restored to their storage places by defendant's employees—not by the tractor-trailer operators. The latter do not go get the equipment or take it back after its use. *Defendant's* employees "put the equipment away." Defendant's receiving clerk "takes care of that." It is "the practice of Orscheln Brothers' employees exclusively to use the equipment there for loading and unloading." After a cylinder is used it is normally "set in the area" in an out-of-the-way place, normally and customarily in the inside or outside (in the hollow) of a U-beam.

On the day in question the terminal manager was in charge of the dock. He had supervision and control over defendant's employees, of which about 30 were on duty at the terminal. Anderson, a tractor-trailer operator employed by Luecking Transfer Company, arrived at defendant's terminal at 3 or 3:30 p.m. for the purpose of delivering some merchandise. He found a line of vehicles waiting to get a space in which to unload. After awaiting his turn he found a space—an aisle about 3 feet wide, which gave him sufficient room to deposit the small amount of freight he was delivering—at door 11. Three fourths of the space was full of freight. It was a busy dock, congested with a great deal of merchandise which had accumulated that day. There was a constant moving of the merchandise across the aisles between the bays and in the main aisle that ran the full length of the terminal.

Anderson backed his trailer in to the dock, parked it with its rear end flush against the edge of the dock. He applied his brakes, placed a wooden block under the left rear wheel to keep the equipment from moving forward, and then, facing the dock, attempted to get from the ground up onto the dock platform, from the driver's side of the trailer. Except for the stairway located at the north end of the dock, which leads to the office, defendant provided no means for the drivers to mount the dock. Anderson tried to mount the dock in the same manner that he and the other drivers always did, i.e., throw themselves on the dock by vaulting, jumping, or climbing up on their equipment the best way they could, and then climbing from the equipment to the dock—the only way of getting up on the dock without using the steps at the end of the dock. Anderson looked up on the dock, did not see anything coming at him, put his left foot on the tire of the left rear wheel of the trailer, grabbed hold of the back end of his trailer with his left hand, threw

his right foot up toward the dock, grabbed the U-beam to his right, at a point about a foot or two above the dock platform (he was able to get a good firm grasp on the post with his fingers and thumb), and started to pull himself up on the dock. When his right foot had moved to a position about 2/3 of the way between the ground and the level of the platform of the dock he looked up and saw this oxygen cylinder coming at him, not over a foot away from his face, falling at him at a 25-degree angle, with the top of the tank toward the south and the bottom to the north. The cylinder "was on the edge of the dock falling toward" him. He was then half-way up over the dock. Afraid that the cylinder would hit him in the head, Anderson turned loose of the post with his right hand. The cylinder kept coming at him. He turned loose with his left hand and started "fighting the tank" as he fell backwards, trying to push it away. He fell on his back on the ground and the cylinder fell on him. Anderson did not see the cylinder until it was 1 foot away from his face. At no time while attempting to mount the dock did Anderson touch the cylinder. Anderson saw no one in the proximity of the place he was about to unload other than defendant's employees. He saw some of them while he was on the ground. They were going up and down the main aisle on the dock, 10 or 12 feet back from the door, in the middle of the warehouse. Photographs of the place where the accident happened show a crack in the concrete floor of the platform. The crack runs from the post to the edge of the platform. There is some cracking, some broken pieces of concrete, at the edge of the dock. If the dock was in the condition shown by the photographs on the date of the accident, a cylinder standing on the cracks would not have stood firmly. To stand the cylinders up on end on the dock is seldom done because of the danger of falling over; it is "too dangerous." Cylinders have been seen sitting up on the dock, although rarely.

Defendant's general sales manager "saw it happen." He was standing on the dock, 15 feet from the edge, about the center of the dock, south of the U-beam. While he could not see the tank from his position, he confirmed that there was a cylinder; that it fell on Anderson, as he was falling back, following an attempt on his part to reach for the post; that "when he went back the tank came out of the post with him." He saw no tank passing or moving between him and Anderson; saw no one carrying a tank or drop a tank, and saw no one rolling a tank there.

■ ■ On the matter of control over the instrumentality: Defendant argues that nowhere in the evidence is it shown that the cylinder was in the exclusive control of defendant; that any other truck driver having access to the loading dock "could have tampered with the cylinder, making it fall * * *." To the contrary, the evidence clearly shows that defendant had exclusive control over the cylinders. Defendant provided and stored these cylinders and kept and used them for a special purpose. Defendant's employees *exclusively* produced them on request, placed them under merchandise, withdrew them after use and stored them adjacent to U-beams or in other out-of-the-way places. The truck drivers *did not* go and get the cylinders when needed, or put them away after use. The fact that others had access to the premises and might have tampered with the cylinders does not detract from the fact that defendant was in control of the cylinders. Answering negatively a like contention this court in McCloskey v. Koplar, 329 Mo. 527, 46 S.W.2d 557, 560 [2], 92 A.L.R. 641, pointed out that the requirement that the instrumentality be under the management and control of the defendant does not mean, and is not limited to, actual physical control, "but refers rather to the right of control at the time the negligence was committed." Van Horn v. Pacific Refining & Roofing Co., 27 Cal. App. 105, 148 P. 951, 953, was cited, in

which in overruling a similar contention the court stated that otherwise the doctrine of res ipsa loquitur could seldom if ever be given application. McCloskey held and we reaffirm that the res ipsa loquitur rule shifts the burden of evidence upon the point of the identity of the party legally responsible, and calls upon the owner to overcome the presumption against it arising out of its ownership, custody and general control of the building. We conclude that there was ample evidence that defendant had the right to control the cylinder at the time of Anderson's injury.

On the question of superior knowledge: Defendant argues that Anderson, experienced in making deliveries at the dock, knew of the use of these cylinders; that a cylinder is not a complicated piece of machinery the arrangements of which are known only to defendant but an ordinary device without any concealed function not obvious to all persons, including Anderson; that Anderson was in close proximity to the cylinder and, with no one else about, was in a superior position to know what caused the cylinder to fall.

■ For res ipsa loquitur to apply the defendant must possess superior knowledge or *means of information* as to the cause of the occurrence. Zurich Insurance Co. v. Missouri Edison Co., Mo.Sup., 384 S.W.2d 623, 626, quoting from McCloskey v. Koplar, supra. Aside from the fact that Anderson knew these cylinders were supplied and used on the premises, it is evident that he knew nothing about the cause of the occurrence; all he knew was that he was suddenly confronted with a falling cylinder one foot away from his face. He had no comparable means of acquiring information as to when, where, and by whom it had been stored prior to the casualty; who, if anyone, was at or about the place where it was located immediately before the occurrence, or what caused it to fall. On the other hand, defendant had about 30 employees working on the premises, all

of whom were subject to questioning by defendant immediately after the occurrence. Also, defendant kept records of incoming freight, which would have disclosed the names of truck drivers who had delivered heavy objects requiring the use of cylinders just prior to that time. From its employees, who were under the supervision of the terminal manager, and from its records, defendant had available to it sources and means of information not open to Anderson, as to the place and manner in which the cylinder in question had been stored, and the cause of its fall. Specifically, defendant was in a superior position to ascertain when heavy merchandise requiring the use of cylinders last had been received at door 11 of the dock; where the cylinder in question had been placed after its last use at dock 11 and how it had been disposed of: whether replaced in the hollow of a U-beam, or left standing on end on the dock, when and by whom, if left standing on its bottom, the condition of the floor at the place where it stood—whether the concrete floor was cracked, broken, etc.; whether it was brushed against or tipped over by someone, and if so when, by whom, and under what circumstances.

■ Although defendant does not raise the point under "Points and Authorities" and therefore strictly speaking is not entitled to have it considered, its real complaint is that the mere fact that the cylinder fell is not sufficient to establish negligence, and that the circumstances do not warrant an inference of negligence on defendant's part; that Anderson's evidence leaves the cause of the accident to speculation, conjecture or surmise. This case comes within the category of falling objects, to which the rule is generally applied. 65 C.J.S. Negligence § 220(12); 38 Am.Jur. Negligence § 306; McCloskey v. Koplar, supra, [1]. Occurrences such as this one (heavy cylinders falling upon workers at freight stations) do not ordinarily happen if those in charge are exercising ordinary care. The cylinder was the property of defendant, and

was part of the equipment used on the dock by defendant's employees, for its own special purposes, and was under the control and management of the defendant. If left standing upright it was dangerous because of its weight and the tendency of a long narrow object to tip over. As argued by respondent, "Ordinary prudence would dictate that, in a busy working place like defendant's dock, where men were moving about constantly with their attention concentrated upon their work, defendant should have provided a rack or similar device for the storage of the cylinder from which it could not fall, or otherwise defendant should have required its employees to lay it down [on its side] in a suitable place [and not stood upright] when it was not in use." Defendant was prima facie responsible for the dangerous situation, whatever may have caused the cylinder to fall. The situation is similar in many respects to that in McCloskey v. Koplar, where a detached radiator fell on a patron in a crowded theatre, breaking his leg. Its fall was not explained by any witness. No persons were nearer than plaintiff, who was 3 feet from the radiator when it tipped over. He was not aware of having bumped or touched it and had not been sitting on it. Since such occurrences do not ordinarily happen when due care is used, and the radiator was the property of the theatre owners and a part of the equipment of the theatre under their control and management, we held that the facts raised an inference of negligence. The fact that the fall was unexplained is no impediment to the application of the doctrine, in a case where the inference of negligence arises. The doctrine was applied notwithstanding the occurrence happened for no apparent reason or known cause in McCloskey v. Koplar, supra, and in Kelly v. Laclede Real Estate & Inv. Co., 348 Mo. 407, 155 S.W.2d 90, 95, 138 A.L.R. 1065; Lamprecht v. Krueger, Mo.App., 46 S.W.2d 908; Garfinkel v. B. Nugent & Bro. Dry Goods Co., Mo.App., 25 S.W.2d 122; and Pollard v. J. J. Newberry Co., Mo.App., 228 S.W.2d 398. It should be applied in the circumstances of this case, which give rise to an inference of negligence in not securing this dangerous instrumentality in a rack, or in not causing it to lie prone on the platform, when not in use, or in allowing it to stand on end in a place with an insecure footing, or in allowing it to lean against merchandise on the dock or against the U-beam, in such a manner as to make it likely that it would fall and hurt someone.

Defendant's second point on appeal is that Anderson was guilty of contributory negligence as a matter of law in (1) pulling the cylinder in question upon himself while attempting to climb upon the dock and (2) selecting a dangerous way to ascend the dock when there was a safe place provided by defendant.

■ (1) The Court cannot rule as a matter of law that Anderson negligently pulled the cylinder over on himself because Anderson testified positively that he did not touch the cylinder. This testimony is uncontradicted. No one testified that Anderson caught hold of the cylinder when he reached for the U-beam. Defendant's general sales manager testified that from his position he could not see whether anderson touched the cylinder. He did say that Anderson reached for the U-beam, and that his momentum was not sufficient for him to "make it"; that he missed the beam and that when he went back the tank came out of the post with him. Assuming but not deciding that this constituted substantial circumstantial evidence that Anderson clutched the tank and caused it to topple over, the question of contributory negligence would still have been for the jury to decide, under proper instructions, and not for the court to declare as a matter of law. We note in passing that defendant did not consider the evidence of contributory negligence sufficiently substantial to offer a contributory negligence instruction.

■ (2) In order to convict Anderson of contributory negligence as a matter of

law in selecting a dangerous way it must appear that the way chosen was so unsafe that a person of ordinary prudence would not choose it. Rogers v. Tegarden Packing Co., 185 Mo.App. 99, 170 S.W. 675. Some of the cases apply the rule when the position taken is one of "imminent danger." Smith v. Ozark Water Mills Co., 215 Mo. App. 129, 238 S.W. 573, 575 [3]. As stated in 65 C.J.S. Negligence § 122, p. 733, "In order that one may be guilty of contributory negligence in selecting the hazardous course, it must appear that he knew and appreciated, or in the exercise of ordinary care should have known and appreciated, that the course chosen was not unlikely to result in his injury." This record does not indicate that there was any imminent danger in mounting the dock in the manner Anderson chose, or that this method was so unsafe that a person of ordinary prudence would not choose it. Anderson testified that his method of getting up on the dock was "a formality" that he used for 31 years in getting up and down on docks. Apparently the drivers did not consider this method unsafe. There was testimony that all of them used Anderson's same method of mounting the dock; that it was the customary and usual way; that it was done "out of habit," and "pretty soon gets to be just a kind of automatic, conditioned reaction" of which the driver is not even aware, "like brushing your teeth in the morning." One driver testified that even if defendant had provided steel steps or pipe ladders with handrails he would not necessarily have used them but would have continued mounting the dock as before; that if it was raining or if the steel steps were on the same side of the truck as the driver's door he would use them, but that it would be a "matter of convenience," and if the steel steps were on the other side of the truck he would not run around the truck to use them. There was no evidence that there was danger involved or that Anderson was aware of any danger inherent in this method, or that in following his custom he was taking any risk, or that Anderson or other drivers had sustained injuries in attempting to scale the dock in this manner. There was no evidence from which it could be said as a matter of law that the danger of injury was imminent or obvious; that the method was so unsafe that a person of ordinary prudence would not choose it, or that it was not unlikely to result in injury. Instead, long experience over the years at this and other docks indicated to Anderson that this was a reasonably safe method. He testified that he had made at least 50 deliveries at this particular dock. There was no evidence that he sustained any injury or difficulty on any previous occasion. Furthermore, it was not the method of ascent that was dangerous. Anderson fell not because of the dangers inherent in the method of ascent adopted, but because of the sudden appearance of the oxygen cylinder flying in his face in mid-air. Certainly he had no reason to suspect that in mounting the dock in his customary way he would suddenly be confronted with the danger of being struck by an oxygen cylinder appearing out of nowhere. For us to reverse this judgment on the law point raised would require us to ignore the evidence and upset the established rules of law on this question.

■ Anderson's contributory negligence in adopting this method was raised in defendant's answer and forcibly argued to the jury by defendant's counsel. Although defendant submitted no instruction on contributory negligence, plaintiff's main verdict-directing instruction required a jury finding that in climbing on the platform Anderson was "exercising ordinary care for his own safety." Defendant thus received the benefit of everything it was entitled to on the question of contributory negligence.

■ Defendant's third point is that plaintiff's evidence was contrary to physical laws and facts. Defendant claims that under Anderson's version of the facts he would have the jury believe that the cylinder came through a solid steel 12″ wide U-beam, and that considering the spaces

and distances to which he testified it was a physical impossibility for Anderson to have pulled himself up with one hand on the left rear corner of the trailer and the other grasping the beam. Defendant's contention is based in part upon the testimony of seven witnesses who under simulated circumstances attempted to mount the platform as Anderson said he had done, and who testified that it was physically impossible of accomplishment; and partly upon Anderson's opinions, estimates and judgments as to spaces and distances, given after he had been in a hospital for 3 years and 3 months, and without having returned to the dock for further inspection prior to giving his testimony. Several times he stated on cross-examination that he had not measured the distance or space involved. The "physical facts" rule upon which defendant relies has no application where variable or doubtful estimates are made with respect to facts. Caffey v. St. Louis-S. F. Ry. Co., Mo.App., 292 S.W.2d 611, 615. The seven witnesses did not establish physical impossibility as a matter of law. The jury was privileged to disbelieve their testimony. The "physical facts" rule has no application where the credibility of witnesses is involved. Caffey v. St. Louis-S. F. Ry. Co., supra.

Defendant's fourth and fifth points are that the trial court "erred in failing to grant defendant's motion for jury view" and "erred in giving Instruction No. 1 offered by plaintiff." Neither point states why it is contended that the court was wrong in its ruling, as required by Civil Rule 83.05(e), V.A.M.R., and therefore nothing has been preserved for review. Notwithstanding, we have considered the argument portion of defendant's brief on these two contentions. On the question of jury view, it was a matter of discretion on the part of the court and there are cogent reasons why the action taken did not constitute an abuse of discretion. On Instruction No. 1 the claimed defects are technical, could not reasonably be said to have af-

fected the final result, and are without merit.

The judgment is affirmed.

WELBORN and HIGGINS, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.