William **EFFINGER**, Plaintiff-Respondent,

v.

**BANK OF ST. LOUIS**, a Corporation, Defendant-Appellant.

No. 33834.

St. Louis Court of Appeals, Missouri.

April 27, 1971.

John A. Walsh, Jr., St. Louis, for defendant-appellant.

William J. Hormberg, Clayton, for plaintiff-respondent.

DOWD, Judge.

A res ipsa loquitur case. Plaintiff, a painter, brought an action to recover damages for injuries received when a metal venetian blind on a window fell and struck him on the head. He and another employee, Andrew Conley, were painting walls on the defendant premises pursuant to a contract between the defendant and plaintiff's employer.

Plaintiff's petition, evidence and submission were predicated on the res ipsa loquitur doctrine. The jury awarded plaintiff $12,000 as damages. The defendant appealed from the ensuing judgment contending: (1) that the evidence was insufficient to support a submission and recovery under this doctrine; (2) that the evidence was insufficient to support the element of de-

fendant's control over the venetian blind; (3) certain medical testimony was erroneously admitted; and, (4) that the verdict and judgment was so grossly excessive as to shock the conscience of the court.

On February 5, 1964 after the bank had closed the plaintiff and Conley were painting defendant's walls. There were a number of windows on these walls which were fitted with venetian blinds. Plaintiff was familiar with these premises having painted there before. They started painting at 5:00 p. m. and at that time the blinds were lowered and plaintiff or his partner raised the blinds. Plaintiff raised the blind which fell.

The blind slips into a box-like top which extends from one side of the blind to the other. At each end this box slips into square, C-shaped brackets. There is a safety catch which is a clasp bar which is hinged from the top of the bracket. This clasp bar locks into the bottom of the bracket which encloses both ends of the box. When the clasp is in a down position the blind cannot be slid out. To get the blind out of the bracket, the blind must be pulled straight out; it cannot be gotten out by being pulled downwardly.

Before the blind fell, plaintiff had painted up to the ceiling and very close to the brackets which held the blind. He had also painted above the blind and beside the box and brackets and down along the sides of the blind. He did not notice anything unusual about the box, brackets or clasp bar; nor did he notice whether the blind was hanging out over the edge of the brackets. He did not notice that the clasp was not hooked; if he had he would have hooked it. He did not unhook the blind. Conley at no time touched the brackets.

After the blind had fallen, the brackets were still in place; and plaintiff did not notice anything wrong with either the brackets or the blind. At no time did plaintiff touch the top of the blind. This blind covers a window about 6 feet wide and about 8 or 9 feet high. It is not the

practice of the painters to take down blinds unless authorized to do so. Plaintiff was told by Marvin Crosby, defendant's maintenance supervisor, not to take down the blinds. Plaintiff asked Crosby why the blinds were not taken down before they started painting and Crosby replied that his men were occupied on another job but that the blinds would be removed the next day. The blinds were taken down eventually by the custodian for the defendant and the plaintiff returned on the Monday following his injury to paint the area covered by the blinds. An employee of the defendant's maintenance crew regularly cleaned the blinds but defendant did not inspect the blinds.

At about 11:00 p. m. on February 5 (a Wednesday), while the plaintiff was painting the wall just above the baseboard under the window, the entire blind fell out of the brackets and the metal right end of the box struck plaintiff on the forehead. He was knocked to a crouched position and he "was bleeding and blood was squirting every place." He was not knocked unconscious. He was staggering and holding his head. He was taken to the hospital where nine stitches were put in his head. He saw his family doctor the next day and again four or five days later when the stitches were removed. He had shooting pains and numbness in the head. He also saw Dr. Joseph J. Gitt two weeks after the accident who examined him, took x-rays of his head and gave him a shot. He has not been released by Dr. Gitt. He was seen by Dr. Gitt thirty-four times over a 4½ year period. On June 6, 1965 which is sixteen months after being injured, he saw Dr. M. Richard Katz. During this sixteen month period he had "shooting pains in his right forehead and headaches almost constantly." It felt like he was being stuck with a knife. He could not wear a hat because the pressure would give him a headache immediately. He cannot wear a hard hat and most construction jobs now require a hard hat. He was operated on by Dr. Katz and after the operation plaintiff

improved but still had a numbness about three inches across and five inches deep (about the size of a hand). "It felt like it itched but you couldn't get to it." He still suffered from headaches at time of trial. As a result of the operation he has a one inch permanent scar above the right eyebrow. He lost about a month from work and lost about $943.00 in wages.

Dr. Katz's deposition was read into evidence. He specialized in neurological surgery which is the diagnosis and surgical treatment of diseases involving the central and peripheral nervous system. Plaintiff complained to Dr. Katz that he had pain and pressure in the right brow of his forehead extending to the right side of his head to his ear. Plaintiff complained that if he wore a hat, pressure resulted and he would have headaches extending to the top of his head. Plaintiff had about a one-half inch linear thickened scar above the right eyebrow. Tapping in the area of the scar caused the patient to complain of a sudden painful sensation over his right eyebrow with the pain extending upward toward the top of his scalp, temple and toward the ear. There was impaired sensation over the right portion of the forehead almost to the midline. Dr. Katz's diagnosis was that there was a neuroma or entrapment of the right supraorbital nerve which caused the pain. A neuroma is an overgrowth of nerve tissue as it tends to regenerate following an operation. "The neuroma is actually a swelling since it becomes a mass, a tumor faction along the course of the nerve." Dr. Katz recommended an operation to remove the neuroma, which he performed at Jewish Hospital on June 7, 1965, with the plaintiff under a local anesthesia. The area of the scar was opened and the nerve was exposed proximally. The swelling was removed and the nerve was then crushed and sewn over so as to prevent the recurrence of a neuroma. Plaintiff complained of pain during the operation. Dr. Katz's prognosis immediately after the operation was "that he should be free of the pain that he was complaining of, but that

he would continue to have numbness" in the area where the nerve had been injured. He was seen again by Dr. Katz on June 21, 1965. At that time plaintiff complained of pounding headaches, painful sensation at the vertex of the skull which bordered the numb area of his right brow. At the time of this visit, he did not have a headache but had been having headaches for at least a year. There was no recurrence of the neuroma and pain in the scar area was not as serious. He still had a zone of anesthesia extending over the right brow to a level just in front of the ear. Dr. Katz prescribed a drug for tension headaches.

Dr. Katz testified as follows:

"Q. Now, after that examination what was your immediate prognosis at that particular time?

"A. I felt that the major complaint; that is, what I felt was related to the neuroma, had been relieved, although there was some question in my mind—"

Defendant's attorney then objected to the balance of the answer "as being speculation and conjecture and also is unresponsive to the question asked." This objection was overruled and Dr. Katz answered as follows:

"A. I felt that the major complaints; that is, what I felt was related to the neuroma, had been relieved, although there was some question in my mind as to where there may be some irritability of the nerve proximal; that is, where the nerve had been crushed which conceivably could still be undegenerated and active."

Dr. Katz next examined plaintiff on March 25, 1968, at which time plaintiff complained of a peculiar sensation in the right brow. Dr. Katz then testified:

"Q. Doctor, in your examination of March 25, 1968 of the plaintiff in this case, in your medical opinion within reasonable medical certainty was this plain-

tiff suffering from a neuroma or a recurrence of the original neuroma?

"A. I would say on clinical grounds, yes."

Dr. Katz then explained that this diagnosis could only be confirmed by an operation and removal and examination under a microscope. He then stated that "[m]y clinical opinion is that an irritable zone which is often of this nerve branch existed." Dr. Katz's diagnosis as of March 25, 1968 was that the pain or symptoms were not so severe as to recommend another operation but he advised plaintiff "to return if he felt the symptoms were disagreeable enough that he would wish to have a re-exploration done." He defined "re-exploration" as another operation. He stated that the temporal headaches were functional.

Portions of Jewish Hospital's records regarding plaintiff were read into evidence. These records showed that plaintiff was a patient at Jewish Hospital from June 5, 1965 to June 10, 1965 and that neurological examination showed: "The sensory perception to pin prick and light touch reveals anesthesia over the right frontal, medial and anterior half of the scalp on the right * * *. DIAGNOSIS: 1. Neuropathy, Supra orbital nerve, right, associated with trauma. 2. Cerebral concussion." The record also showed a detailed description of the operation which is not necessary to set out here because of Dr. Katz's testimony.

Dr. Louis A. Reuter examined plaintiff for the defendant on January 9, 1969. He testified that the plaintiff complained of a numb feeling of the forehead and frontal region of the scalp and a pressure feeling around this area. He complained that the wind, cold or dampness caused him pain. And, he complained of two scars on the right forehead. Dr. Reuter testified that plaintiff had a one-inch vertical scar, and another transverse scar in the eyebrow and these two scars met at the midline. There was a sensitive feeling where the two scars met and for about five and a half

inches up to the forehead and into the scalp he had a numb feeling. He testified that the operation for the removal of a neuroma was a minor operation. His diagnosis: "A numbness from diminution of sensation; a numbness from where this transverse scar is up into the—of the forehead up into the scalp—the frontal region of the scalp—which shows that there was some damage to the nerve controlling or supplying that area of the body."

Defendant's first contention is that the evidence was insufficient to support a submission and recovery under the res ipsa loquitur doctrine and that a directed verdict should have been sustained.

However, since the jury found in favor of the plaintiff, we must, in reviewing the evidence to determine its sufficiency consider the evidence in the light most favorable to the plaintiff and give him the benefit of all reasonable inferences from it. Layton v. Palmer, Mo., 309 S.W.2d 561 [1].

The res ipsa loquitur doctrine only applies when: (a) the occurrence resulting in injury was such as does not ordinarily happen if those in charge use due care; (b) the instrumentalities involved were under the management and control of the defendant; (c) and the defendant possesses superior knowledge or means of information as to the cause of the occurrence. Layton v. Palmer, supra, [2]; Roddy v. General Motors Corporation, Mo., 380 S.W.2d 328 [1]; McCloskey v. Koplar, 329 Mo. 527, 46 S.W.2d 557, 559, 92 A.L.R. 641.

Considering the evidence in the light most favorable to plaintiff to determine whether the evidence proved the elements under the res ipsa loquitur doctrine, we are convinced that the plaintiff made a submissible case. Here the evidence shows the plaintiff while painting the wall above the baseboard was struck on the forehead by the metal blind which fell out of the brackets. The plaintiff had not unhooked the blind; had not touched the

blind; and, had noticed nothing wrong with the blind or the brackets. The jury could reasonably find that a blind would not ordinarily fall out of its brackets if those in charge had used due care. The evidence here failed to show what caused the blind to fall out of its brackets. However, the doctrine has been applied notwithstanding the occurrence was unexplained or happened for no apparent reason or known cause. Anderson v. Oscheln Bros. Truck Lines, Inc., Mo., 393 S.W.2d 452, 458; McCloskey v. Koplar, supra.

It is likewise clear from the evidence that the blind was under the control of the defendant. In *Roddy*, supra, the court quoting from *McCloskey*, supra, stated 380 S.W.2d at l. c. 331: "It is also well established that 'the requirement that the instrumentality be under the management and control of the defendant does not mean, or is not limited to, actual physical control, but refers rather to the right of control at the time' of the occurrence. McCloskey v. Koplar, 329 Mo. 527, 46 S.W.2d 557, 560." Here the evidence shows that it is not the practice of painters to take down blinds unless authorized to do so. In fact, plaintiff was told specifically by defendant's maintenance supervisor not to take down the blinds and that the blinds would be taken down by defendant's employees. These blinds were eventually taken down by the defendant.

Defendant argues that the evidence showed that there are only three possibilities which could account for the falling of the blind: (1) the brackets holding the blind fell; (2) someone pulled the blind forward out of the brackets; (3) the clasps were open and the blind was partially out of the brackets so that a vibration could cause it to overbalance and fall. Defendant then argues that the evidence negated these three possibilities. The fallacy of this argument is that the record does not show that there only exists three possibilities to account for the falling of the blind. The whole thrust of plaintiff's testimony is that he did not notice anything unusual about

the blind, brackets, or the safety catch. Nor did he notice whether the safety catch was unhooked. As said, the evidence does not show what caused the blind to fall.

■ The next point raised by the defendant is, "[t]he court erred prejudicially in overruling defendant's' objection to that part of Dr. Katz's testimony as to his prognosis in which he testified ' * * * there was some question in my mind as to where there may be some irritability of the nerve proximal; that is, where the nerve had been crushed which conceivably could still be undegenerated and active.', for the reason that said portion of the prognosis is speculative and conjectural by its own terms, and yet puts nerve irritability before the jury as an item of damage."

The defendant's complaint concerns the deposition-testimony of Dr. Katz relating to his "immediate prognosis" of plaintiff after his examination of plaintiff on June 21, 1965 which was two weeks after the operation. This testimony in question and answer form and defendant's objection is set out earlier in the opinion.

It is clear that this opinion by Dr. Katz only related to his "immediate prognosis" at the time of his post-operation examination. This testimony must be considered along with the testimony of Dr. Katz concerning his examination of plaintiff on March 25, 1968 which is two years and nine months following his examination of June 21, 1965. At the examination of March 25, 1968 the plaintiff complained of a peculiar sensation in the right brow. Based on his examination of March 25, 1968 Dr. Katz in reply to a question based on "reasonable medical certainty" stated his medical opinion was that plaintiff suffered from a neuroma or a recurrence of the original neuroma and that "[m]y clinical opinion is that an irritable zone which is often of this nerve branch existed."

Dr. Katz's testimony when viewed in its entirety rather than in isolated sections

removes it from the realm of speculation. Stephens v. Guffey, Mo., 409 S.W.2d 62, 70.

This is especially true here where Dr. Katz in his final diagnosis given two years and nine months after the operation found a "neuroma or a recurrence of the original neuroma," and found an irritable zone of the nerve branch.

Defendant relies on Hahn v. McDowell, Mo.App., 349 S.W.2d 479 which involved medical testimony of two physicians that there was a possibility of cancer developing in the site of a burn scar. Neither medical opinion was based on reasonable medical certainty which is unlike the final diagnosis here which found a neuroma and an irritable zone of the nerve branch.

■ Finally, defendant contends that the verdict for $12,000 is excessive requiring reversal or remittitur. Defendant relies on Jackson v. Cherokee Drug Co., Mo.App., 434 S.W.2d 257 which was decided by this court. The *Jackson* case is distinguishable. In *Jackson* the plaintiff was 48 years of age at the time of accident and there is no showing of any lost wages; while here the record shows that plaintiff was age 40 at the time of accident and lost $943.00 in wages. The injuries are also different. Plaintiff here had headaches almost constantly for sixteen or seventeen months before his operation, and has a permanent scar on his forehead. He has a severed nerve with resulting numbness in an area over the right eye. He was treated by three doctors and underwent an operation for a neuroma. Two years and nine months after the operation, the doctor found that there had been a recurrence of the neuroma, and an irritable zone of the nerve branch. Also, the case here comes to us in a different posture than *Jackson*. In *Jackson*, the trial court ordered a remittitur of $2,500 from a jury verdict of $12,000. The plaintiff accepted the remittitur. The court then rejected defendant's further attack that the verdict was excessive. Here the trial judge overruled defendant's post trial motion where it contended the verdict was grossly excessive. Our Supreme Court in Homeyer v. Wyandotte Chemical Corporation, Mo., 421 S.W.2d 306 affirmed a judgment for $350.00 for personal injuries in a suit praying for $65,000 based on a cervical sprain. The doctor's bill was $2,825 and the prescription cost was $165.82. Plaintiff's appeal was based on the single ground that the verdict was inadequate. The court in *Homeyer*, supra, stated at l. c. 309: "[1–3] In a tort action the determination of the amount awarded for personal injuries is a matter resting primarily in the discretion of the jury in that it involves the credibility of witnesses and the weight and value to be given their testimony on a fact issue."

■ Where the verdict has the approval of the trial court, it is conclusive on appeal unless it is so shockingly and grossly excessive or inadequate as to indicate that the amount of the verdict is due to passion and prejudice. Boehmer v. Boggiano, Mo., 412 S.W.2d 103 [10]; Homeyer v. Wyandotte Chemical Corporation, supra, [5]. Here the experienced trial judge who personally observed the trial approved the verdict by rejecting defendant's contention that the verdict was grossly excessive.

Under the evidence here, with the injuries sustained and the lost wages involved, we cannot hold that the verdict was grossly excessive or the result of passion and prejudice.

Judgment is affirmed.

BRADY, P. J., and WOLFE, J., concur.