**LYLE MUNSON, Plaintiff**

v.

**ANDRE DUVAL and LIBERTY HALL REALTY COMPANY, Defendants**

Civil No. 598-1973

District Court of the Virgin Islands

Div. of St. Croix

April 15, 1975

MERWIN, ALEXANDER & O'BRIEN, ESQS. (DAVID O'BRIEN of counsel), Christiansted, St. Croix, V.I.

ISHERWOOD, COLIANNI, ALKON & BARNARD, ESQS. (THOMAS ALKON of counsel), Christiansted, St. Croix, V.I.

GRUNERT, STOUT, HYMES & MAYER, ESQS. (JOHN R. MAYER of counsel), St. Thomas, V.I.

J. MICHAEL SPENCER of counsel, Frederiksted, St. Croix, V.I.

CHRISTIAN, *Chief Judge*

## MEMORANDUM OPINION

This case in tort arises from an accident which occurred August 5, 1972. Plaintiff, Lyle Munson, was engaged at

that time as a sandblaster for third-party defendant Communication Systems & Maintenance Corporation (CSM), of which he was also vice-president. CSM had been retained by defendant Liberty Hall Realty Company to do sandblasting on an old building in Frederiksted, St. Croix, Liberty Hall, which that company had recently purchased with the intention of remodeling and renovating it. Defendant Andre Duval, at all times pertinent to this action, was both a partner in Liberty Hall Realty Co., and the owner of the construction company hired by Liberty Hall as the independent contractor in the renovation project. Munson has brought suit against defendants seeking damages for alleged serious and permanent injuries he sustained when he fell some fifteen feet from a scaffold to the ground, while performing his job.[1]

The contract was negotiated by Ernest Whittaker, president of CSM, and Duval, who signed the contract as "Owner". The contract, a standard form used in the regular course of business and prepared by CSM, contained the following provision as to scaffolding:

If scaffolding or swing staging is needed to do this work, it will be furnished by [CSM] unless otherwise arranged.

Whittaker testified, and Duval conceded at trial, after vehement denials in the pleadings, that the parties had agreed that since Duval would in any event provide scaffolding at the site for his own workmen, the initial contract price of $8,000 for the sandblasting job would be reduced to $6,000 in exchange for CSM's use of the scaffolding already erected by Duval. Although the arrangement regarding the scaffolding was never reduced to writing, the written contract

---

[1] Plaintiff has not included CSM, his employer, as a defendant as he has received Workmen's Compensation payments as a result of the accident, and thus is precluded by law from bringing suit against his employer. See 24 V.I.C. § 284. Defendant Duval, however, has brought CSM in as a third-party defendant on various grounds to be discussed infra.

did recite the lower figure, $6,000, as the price to be paid to CSM.

Whittaker testified that at the outset his men had attempted to do their work on normal working days when Duval's crew was also on the site. However, from all accounts, sandblasting is a dirty, dusty and unpleasant job, and Whittaker claims that defendant's foreman instructed him to do that work on weekends only in order to avoid interference with the other work going on at the site. Whittaker, Munson and Robert Jones all refer to defendant's foreman as Ernie Smith. Duval denied that any person so named ever worked for him, and that his foreman's name in fact was Ernie Miner. In light of the fact that all parties stated they dealt with someone of the same first name, I find that Ernie Smith and Ernie Miner are one and the same person, and was employed by defendant as foreman on the construction site. Whittaker does not recall whether or not Duval was present at the time of this conversation. Pursuant to this request, Munson and a crew of two arrived at Liberty Hall the weekend prior to the accident and proceeded, without event, to do sandblasting on the front of the building as required by the contract. When they arrived, they used the scaffolding provided by Duval, in place as they found it. On that day Munson himself had done the sandblasting, and had used a wooden ladder found near the place they were working, to climb to the upper tiers of the scaffolding. He stated at trial that he had used that ladder rather than the one built into the scaffold because it could be tilted at an angle, which made it easier to reach the platform on the very top of the structure. The scaffolding itself was of the metal, tubular sort, made up of three tiers, each of which was about six feet high. At each tier there was a platform made of plywood, on which the worker stood or sat while performing his job. At either side of the structure was a built-in metal ladder, which extended

up to just a little short of the top of the scaffolding. That is, it ended approximately one foot below the platform of the uppermost tier. As shown on pictures admitted into evidence, there were no handrails extending past the last rung of these built-in ladders.

The following weekend, the day of the accident, Munson arrived at work with only one Robert Jones as crew. Both men were salaried employees of CSM, as opposed to the two men who had helped Munson the week before, who were paid by the hour. The scaffold was in a different location from where it had been when Munson had worked on the previous weekend, and I find that it had been moved by Duval's crew sometime during the week. Plaintiff says he and Jones used it exactly where they found it that Saturday morning. While Jones was on the scaffold, doing the actual sandblasting, plaintiff was on the ground tending the blasting pot.[2] Jones, working on the second tier of the scaffold, had looped the hose over the top of the structure and tied it with a rope to a pin of the scaffolding in order to keep it steady while he applied the nozzle. Noticing that the hose had become "snagged," making it impossible to proceed further with his work, Jones called down to Munson asking him to go up and free the hose. After shutting down the blasting pot, Munson climbed to the third tier using the metal ladder built into the scaffolding. He said he did not use the wooden one he had used the previous week because it was not visible on the site. As he got to the top of the ladder he grabbed on to a piece of 2 x 4 which he supposed to be a toeboard, intending to support his weight on it and thus hoist himself up onto the platform. The 2 x 4

---

[2] It was explained to the Court at trial that three pieces of machinery are used in the process of sandblasting. The portable blasting pot, weighing about 300 pounds, which stays on the ground and is moved by a crew member; a compressor; and the hose itself. Whittaker and Duval testified that they usually used three men to do this job, whereas Munson and Jones, who had had supervisory experience, both stated that they usually worked this operation with only two men, one to move the pot, the other to work the hose.

which he grabbed was not adequately secured and he fell backwards down the full twelve to fifteen feet to the steps of the building. When he hit the ground, landing on his feet, he "crumbled up" and knocked his chin against a truck which was parked there. Jones testified that while Munson was lying injured on the ground, he asked him what had happened, to which plaintiff replied that he had grabbed the toeboard and fallen. Jones further testified that when he looked up, he was able to see the toeboard "turned around" and sticking out at an angle from the scaffolding.

A toeboard, as used in the industry, is a piece of timber, in this case a 2 x 4, which is fastened by means of nails to the end of the platform on each level of the scaffold. According to all the parties and a witness, one Luis Suarez, who was accepted by the Court as a safety expert, toeboards serve three functions with regard to scaffolds. The first is to prevent tools or anything else from rolling over the side of the platform and down to the ground. The second is to warn workmen on the platform that they are approaching the edge. Thirdly, and all persons except Duval agreed, toeboards are often used by workmen to hoist themselves up onto platforms, which is exactly what Munson attempted to do.

Plaintiff bases his claim on the theory that defendants owed him a duty of providing him with a safe place, and safe instrumentalities, with, and on which to work. He alleges several violations of that duty, namely the unsecured toeboard, the absence of handrails, and the failure of the attached ladder to extend at least thirty-six inches above the platform.

■ Defendant Liberty Hall moved, at the conclusion of the testimony, to have the case dismissed as to it, a motion which was taken under advisement and is still pending. Plaintiff advances three arguments which he urges justify finding liability against the owner of the building. The first

of these is the bald fact of Duval's partnership interest in the Realty Company which owns the property in question. Of all the cases cited in support of this argument, only one is really helpful to the plaintiff. In that case, Keiswetter v. Rubenstein and Hammell, 235 Mich. 36, 209 N.W. 154 (1926), the facts were strikingly similar. There Hammell, the owner of eleven lots on which he wanted cottages constructed, entered into an agreement with Rubenstein, a contractor, under the terms of which Hammell would pay for and supply Rubenstein with all the materials, which Rubenstein would then use to build the required cottages. A scheme was arranged whereby Hammell would be entitled to the first $500 profit, Rubenstein to the second, the balance over that to be split equally by the two. In the course of construction, a plumber was injured when the building in which he was working collapsed because Rubenstein was negligent in bracing the building. The court held that Hammell and Rubenstein had at the very least, entered into a joint adventure, and the negligence of one was the negligence of the other, thus holding Hammell also liable to the injured workman.

Keiswetter is, however, a very old case, and a thorough shepardization of it has failed to uncover another like it. It is without exception cited for its language on the law of joint adventure, which is of no import here as we have a written partnership agreement on which to base the mutual obligations of the partners, if such are to be found. In that Agreement, it is provided at Clause 12(c), page 7:

The fact that a partner, general or limited . . . is employed by or is directly or indirectly interested in or connected with . . . any . . . firm or corporation employed by the Partnership to render or perform a service . . . , shall not prohibit the General Partner from . . . employing such person, firm or corporation or from otherwise dealing with him or it, *and neither the Partnership or any of the partners as such, shall have any rights in or to any income or profits derived therefrom.* (Emphasis supplied.)

It seems to us that this clause specifically anticipates the present situation, where the construction firm of one of the limited partners is employed by the Partnership to do certain contracting work. Since it clearly by its terms does not entitle the partnership or individual partners to the profits thus earned, I think it a necessary corollary that neither should they share in any liabilities incurred in the course of that profit making.

The difficulty in deciding this motion is the complicating factor of Duval's wearing, figuratively, two hats. He is, on the one hand, a limited partner in Liberty Hall Realty Company, the owner of the building. On the other hand, he is the owner of the construction company hired by Liberty Hall to supervise and execute the restoration of the building. Thus, the question might be raised whether CSM, in doing business with Duval, was dealing with him as its general contractor or as the owner of the building, or both. This goes not only to the capacity in which Duval signed the contract with CSM, but also to the question of what duty of care is owed by whom.

▮ Plaintiff's second argument is based on the Restatement of Torts 2d Section 414[3] and Quinones v. Upper Moreland Township, 187 F. Supp. 260, aff'd 293 F.2d 237 (3rd Cir. 1961). The above authorities are cited for the proposition that Liberty Hall exercised sufficient control and supervision over the renovation work, via the inspections and control performed by its partner Duval, to warrant its being held liable. Nevertheless, we believe that Duval's actual presence, and constructive presence through his supervisor Ernie Miner, was primarily in his role as contractor on the project. The question becomes whether,

---

[3] The text of Restatement Torts 2d Section 414 is as follows:
One who entrusts work to an independent contractor, but who retains the control of any part of the work is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

merely because of his dual role as part-owner of the premises, his presence constituted control by the owner as well. We think not. Were it a matter of *scienter* of some blatant negligence or defect which were to be attributed to the owner, then perhaps the distinction in Duval's role would blur somewhat, as he could not be aware of such a thing as contractor but not as owner. However, when dealing with the problem of what duty is owed to a particular class of plaintiff, and the problem ultimately turns on which "hat" Duval was wearing at the time, we think it is a better rule to limit the liability to the most reasonable interpretation of his function at the time. Duval, qua contractor, hired CSM to execute a portion of the work his construction company had contracted with Liberty Hall to perform; the scaffolding out of which the accident arose was placed there for the benefit and use of Duval's construction personnel pursuant to that contract. I therefore conclude that when considering what duty was owed plaintiff by Duval, we must treat the latter in his role as prime contractor, not part-owner of the building. Thus, in terms of Section 414 of the Restatement, the supervision retained by Duval must be attributed to the contractor, not the owner. This is strengthened by the fact that the only specific instance of retention of control which could be alleged, the instruction to CSM to work only on Saturday, was initiated not by Duval himself, but by his job superintendent Ernie Miner. I thus find, and hold, that the owner did not retain sufficient control of the building to impose liability under Section 414. The Quinones case is easily distinguishable, in that there the supervising engineer, who by the terms of his contract was given control of the "manner, performance and rate of the progress," was an employee of the Township/Owner, and had no connection at all with the contractor.

As is obvious from the above, I find also that the contract between Duval and CSM, in which CSM was retained

to do the sandblasting on the building, was signed by Duval as owner of the construction company, not of Liberty Hall. This conclusion is reinforced by the observation that by the terms of the Partnership Agreement (Exh. D), Duval was only a limited partner, and that the general partner, Anthony J. Ayer, was given the power to make all contracts in behalf of the partnership (Clause 12).

The third and final theory advanced by plaintiff is one of vicarious liability. As is pointed out in the Introductory Note to Topic 2, Chapter 15 of the Restatement of Torts 2d (p. 394):

> The rules stated in the following [sections] . . . do not rest upon any personal negligence of the employer. They are rules of vicarious liability, making the employer liable for the negligence of the individual contractor, irrespective of whether the employer has himself been at fault. They arise in situations in which, for reasons of policy, the employer is not permitted to shift the responsibility for the proper conduct of the work to the contractor.

Plaintiff particularly urges that we view Sections 416[4] and 427[5] of the Restatement 2d of Torts as proper authority for holding Liberty Hall liable for Duval's alleged negligence in not providing Munson and his crew with adequately secure scaffolding. These sections deal with work taken on by the independent contractor which involves a "special danger" or a "peculiar risk" of physical harm unless special precautions are taken. The precautions which should

---

[4] The text of Section 416 reads as follows:
One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise.

[5] The text of Section 427 reads as follows:
One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger.

have been taken, according to plaintiff, are the fastening of the toeboard, the provision of hand rails, and side rails extending at least thirty-six inches above the platform on the third tier of the scaffolding.

The general rule has always been that the owner/employer is not liable for the injuries to third parties which are a result of the negligence of the independent contractor. Restatement of Torts 2d Section 409. However this postulate has been so eroded in recent years that the rule is often considered "primarily important as a preamble to the catalog of its exceptions." Pacific Fire Ins. Co. v. Kenny Boiler & Mfg. Co., 201 Minn. 500, 277 N.W. 226 (1937), quoted in Restatement of Torts 2d Section 409 comment b (p. 370). A much more recent observation that the rule is most often honored in the breach was made by the court in Fonesca v. Orange County, 28 Cal. App.3d 361, 104 Cal. Rptr. 566, 568 (1972), in which it was stated:

> [T]he general rule is subject to exceptions of such magnitude as to leave only a small area in which the general rule operates . . . . In fact, the exceptions have almost emasculated the general rule.

One reflection of the growth of the law in this area are the sections urged upon us by the plaintiff, the cumulative effect of which seems to be a construction favorable to a finding of liability against Liberty Hall regardless of lack of negligence attributable to it.

Two determinations must be made before these sections are applied to the case at bar. First of these is whether the work here involved comes within the Restatement language of a "peculiar risk," and second, whether plaintiff comes within the class of "others" which the Restatement seeks to protect.

There are many cases in which working at heights far above the ground is held to pose an inherently recognizable risk. In Fonesca v. Orange County, supra, the plaintiff fell from a bridge which his employer, the independent con-

tractor, was building, and one of the findings of negligence was the failure of the latter to erect scaffolding in compliance with state safety orders. The court there found that the building of a scaffold was a precaution which the contractor should have taken (for which failure, the owner/employer was responsible) in view of the risk involved in working at heights. Similarly, in Stilson v. Moulton-Niguel Water District, 21 Cal. App.3d 928, 98 Cal. Rptr. 914 (1972), the plaintiff fell some ten feet from a concrete wall he was constructing, and one of the indicia of negligence on the part of his employer, attributable to the employer/owner, was the failure to erect railings and scaffolding. While it is, of course, true that defendant Duval in the instant case did, indeed, erect scaffolding, the provision of a faulty or dangerous instrumentality (the claim here) is as dangerous to someone working on it as is the failure to provide it at all (as in Stilson, supra). Indeed, it could be argued that it is even more perilous, as it lulls the laborer into a false sense of security.

The potentially dangerous nature of working on scaffolding is explicitly recognized by the Restatement, Section 427, Comment c., in which it was noted that

[T]he use of a scaffold in painting the wall of a building above the sidewalk involves a recognizable risk that the scaffold, paint brush or bucket, or the painter himself, may fall and injure someone passing below.

Thus, in Illustration 1 of the same Restatement section, the following example is given in which the owner/employer is held liable:

1. A employs B, an independent contractor, to paint the wall of his building above the public sidewalk, In the course of the work a workman employed by B drops his paint bucket, which falls upon C, a pedestrian, and injures him. The danger is inherent in the work, and A is subject to liability to C.

629

It can therefore be seen that, at the very least, the Restatement anticipates the likelihood of something, "or someone," falling from the scaffolding, merely from the existence of the scaffolding. The question becomes, then, whether the concern evinced by the Commentators is directed solely at the hapless passerby, or whether the protection of the owner/employer's liability extends to the person who falls as well. That is, whether the independent contractor's employee, or as in the instant case, an employee of the contractor's subcontractor, is entitled to the benefits set out by these sections.

Although the principles set out in the Restatement are to be considered law in the Virgin Islands in the absence of a statutory provision to the contrary (1 VIC Section 4), the meaning of the terms "others" in Sections 416 and 427 is unclear, and there has been no judicial interpretation of it in this jurisdiction. Among the states that have addressed the problem, however, there is irreconcilable conflict, with equally reputable authority on each side. One of the most exhaustive examinations of the issue was found in the court's opinion in Welker v. Kennecott Copper Co., 1 Ariz. App. 395, 403 P.2d 330 (1965). After painstaking analysis of the case law on both sides, and an examination of Restatement drafts, both adopted and unadopted, the court there came to the conclusion that the term "others" does not apply to employees of the independent contractor, and therefore the owner/employer could not be found liable even by means of vicarious liability. Its reasons were twofold. First, was the fact that the policy behind liability of the owner/employer, i.e., not permitting it to "escape liability by the device of a contract with an independent contractor," did not apply, as the owner/employer was paying Workmen's Compensation insurance, either directly or indirectly. Secondly, the Court noted the disastrously nebulous distinctions being made between work of such a nature

that, if properly done, no injurious consequences could arise, and that from which damages are likely to arise unless precautionary measures are adopted, observing that in the construction industry the distinction becomes unreasonable and difficult in the extreme to apply. We are not so much concerned here with the second prong of that argument, as the cases and the examples given in the Restatement itself, indicate that working on a scaffold does present the kind of peculiar risk Sections 416 and 427 were designed to cover, and that Duval's failure to provide the proper safety measures, if such a claim is proved, is properly within the ambit of the principles therein laid out.

An equally well-reasoned case which held the other way is Wagner v. Grannis, 287 F.Supp. 18 (W.D.Pa. 1968). There the federal court, applying long-standing Pennsylvania principles and interpretation of the Restatement (which was there also adopted as state law), concluded that the term "others" did, indeed, extend to employees of an independent contractor working on the owner's land. In discussing the workmen's compensation argument which was so strenuously urged in Welker, the court noted

We think that the policy in some other jurisdictions of denying recovery in such cases to employees of the contractor is based upon considerations of the effect of the workmen's compensation statutes in those states. Workmen's compensation systems vary considerably in their applicability and in their procedural aspects, and these variances could induce a different view of the employee's rights against the owner of the premises upon which he is called to work. However, in Pennsylvania, the courts have refused to restrict the workmen's compensation law beyond the clear terms of the statute . . . Third party actions on behalf of injured employees are a well-established procedure in Pennsylvania and are recognized by the statute. 287 F.Supp. at 26.

Third party actions are as well recognized here in the Virgin Islands. Otherwise, plaintiff here could not properly have brought suit against the prime contractor, Duval. No one has suggested at any point prior to, during or after the

trial of this case that this plaintiff lacks standing to sue these defendants.

Nor are we in agreement with the reasoning in Olson v. Kilstofte and Vosejpka, Inc., 327 F.Supp. 583 (D.Minn. 1971), where the court held that "the independent contractor in effect is made the agent of the owner with respect to the performance of certain non-delegable duties (i.e., to provide the workers with a safe place to work)." As was observed in the Fonesca case, supra, the vicarious liability provided for in Sections 416 and 427 has nothing to do with an agency relationship between the owner and the independent contractor, actual or constructive. It is based on a policy commitment that when workmen are forced to expose themselves to situations which are potentially dangerous, where that danger is reasonably foreseeable, the responsibility for their safety must be shared by all those having an interest in the fruits of the labor.

Without taking or even indicating, a position on whether the owner/employer is liable to an injured employee of his independent contractor, we feel compelled to disclose that we are strongly troubled by one small fact before us which was totally absent in all the cases cited above, on both sides of the issue. In the instant case the injured plaintiff is *not*, strictly speaking, an employee of the owner-employer, but rather an employee of the sub-contractor of the independent contractor. It is an interesting observation that a thorough exploration of all the cases on this subject, from every conceivable angle, fails to reveal a reported case in which the injured subcontractor's employee even *brought* suit against the owner of the premises, let alone prevailed on any theory. Rather, the suits have uniformly been brought against the general contractor, who stands in the same position as does Duval.[6]

---

[6] There are several cases factually on all fours with the one before us, both of old and recent vintage. In none of these has the plaintiff sought recovery from the owner of the premises. See text, pp. 19–23 infra.

It could, of course, be argued that by doing part of the work which Duval contracted with Liberty Hall to perform, CSM placed itself in the position of Duval's agent thus, for purposes of his relationship with Liberty Hall, becoming its employee. In other words, Liberty Hall's liability would be the same as if Munson were one of Duval's own construction crew. We are not persuaded, however, that so onerous a duty as vicarious liability should be imputed by means of such circuitous reasoning.[7]

■ Admittedly, the theory of vicarious liability is not without merit, and, were the traditional factual pattern before us, conceivably we might adopt the minority Pennsylvania rule which permits an injured employee of an independent contractor to recover from the owner of the premises.[8] Such is not the case, however, and we are of the opinion that to not only break new ground in this jurisdiction by adopting that position, but to extend it to employees of a subcontractor also, would be to do more than is proper at this time. It is probable that once there has been more litigation on the definition of "others" as used in the relevant sections of the Restatement, in the course of which more varied factual patterns must emerge, an appropriate case, at another time, will present an opportunity to hold otherwise. However, as the law now stands, we do not feel justified in applying a minority rule in a setting where the owner's privity is even further removed than usual.

■ In light of the foregoing, none of the theories put forward by plaintiff are adequate to impute liability to defendant Liberty Hall Realty Company, and, consequently, as to that defendant the suit will stand dismissed.

---

[7] Acceptance of such a theory would also have the probable effect of precluding suit by Munson against Duval, as it would then be in the position of Employer, and suit would be barred by the Workmen's Compensation statute.

[8] Such a pattern is not before us, however, and any opinion we here express is no more than obiter dictum.

We turn next to Munson's negligence claim against Duval. It is undisputed that plaintiff's accident was a direct result of his having grabbed the 2 x 4, which he supposed to be a toeboard, which was not properly secured to the edge of the platform. It is further clear that had Munson used the wooden ladder which he had used the previous week, he would have had no need to grasp the toeboard in order to hoist himself up onto the platform.

In determining whether those facts constitute negligence on the part of Duval, the starting point is the proposition that by the terms of the agreement between the parties Duval Construction Company agreed to provide, for the use of CSM, the scaffolding which Duval had erected for his company's use. Section 392 of the Restatement 2d of Torts provides:

> One who supplies to another, directly or through a third person, a chattel to be used for the supplier's business purposes is subject to liability to those for whose use the chattel is supplied, or to those whom he should expect to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by persons for whose use the chattel is supplied
>
> (a) if the supplier fails to exercise reasonable care to make the chattel safe for the use for which it is supplied, or
>
> (b) if he fails to exercise reasonable care to discover its dangerous condition or character, and to inform those whom he should expect to use it.

Comment b. explains that "the words 'supplying a chattel to be used for the supplier's business purposes' apply not only where the possession or custody of the chattel is given to the other or to a third party for the use of the other, but also where others are permitted to use or share in the use of a chattel while it remains in the supplier's possession or custody." It is obvious that if Duval is found to have been negligent, his liability under this section is clearly spelled out. Illustration 2 is an exact description of the facts here:

2. A is the principal contractor for the erection of a building. He lets out the various parts of the work to subcontractors. His contracts with them require him to provide all necessary scaffoldings. A servant of any of the subcontractors who goes upon the scaffolding is using it for the business purposes of the contractor.

See also Oden Construction Co. v. McPhail, 223 So.2d 586 (Miss. 1969).

The duty of care owed by Duval to Munson is stated by the Restatement as being "not only to give warning of dangers which he knows are involved in the use of the article, or which, from facts within his knowledge he knows are likely to be so involved, but also to subject the article to such an inspection as the danger of using it in a defective condition makes it reasonable to require of him." Comment a. Section 392.

Munson's claim is two-fold: First, he argues that Duval supplied him with an inherently unsafe structure because of the lack of side rails extending past the third tier platform, and second, that a proper inspection by Duval would have disclosed the loose 2 x 4, and thus have prompted correction of that dangerous condition.

There were several photographs admitted into evidence which had been taken the weekend prior to the accident (Plaintiff's Exhs. 2–10; Defendant's Exhs. A–E), which depict both the scaffolding and Munson in the process of sandblasting. No evidence having been offered to the contrary, we assume that it was similarly erected the day of the accident. Many of these pictures, especially Exhibit 10, show clearly that the scaffolding was equipped with neither guardrails nor a thirty-six inch extension above the ladder.

The safety regulations promulgated under the Occupational Safety and Health Act, 29 C.F.R. Section 1926.450–51, contain, inter alia, the requirements that side rails shall extend not less than thirty-six inches above the landing (1926.450(9)), and that guardrails and toeboard shall be

635

installed on all open sides and ends of platforms more than ten feet above the ground or floor (1926.451(4)). Although the OSHA was not effective in the Virgin Islands at the time of this accident,[9] and is possibly not to be used as the basis of a finding of negligence per se in any event, its requirements nonetheless accurately reflect customary safety standards in the industry which have been codified in previous authorities. Plaintiff's witness Luis Suarez testified in detail on this question. Mr. Suarez's credentials as a safety expert were flawless, and his opinion that the scaffolding in question was unsafe was based on the OSHA regulations, the Construction Safety and Health Standards, and his experience.

We agree that the scaffolding was unsafe in its lack of guardrails and a thirty-six inch extension of the ladder. In so doing we rely on all the evidence presented, and not exclusively on the fact that certain requirements are set out in any particular code. Of particular note is the fact that Duval did supply a wooden ladder to *his* employees, which ladder was high enough to permit access to the third tier platform without resorting to the toeboard as a hoist. From the fact that the wooden ladder was available on the first Saturday Munson worked, and that there was testimony that it had been put away for the weekend so as to avoid unauthorized use, we draw the inferences that (a) the ladder was used by Duval's crew as a necessary adjunct to the scaffolding, and (b) it was so used because Duval was at the very least aware that its implementation made access to and from the upper levels of the scaffolding safer. Duval's foreman was on the site on the day of the accident, though not at the spot at which plaintiff was working. Nor did they converse. We think it is reasonable to conclude that by providing his own men with a safety pre-

---

[9] The effective date of Bill No. 5807, 24 V.I.C. Sections 31 through 52, was October 1, 1973.

caution which he did not similarly have ever-ready for CSM, Duval was negligent in terms of his agreement with CSM and of the Restatement 2d Section 392.

In addition, we are also of the opinion that Duval was negligent regarding the loose toeboard. Since the scaffolding was in a different location when Munson arrived on August 5 than it had been on the previous weekend, and since Munson and Jones used it in place and did not at that time move it, it is axiomatic that Duval, or one of his crew, last had control and supervision of its positioning. We are convinced by the testimony offered that Munson was doing nothing improper or wildly foolhardy in attempting to use the 2 x 4 as he did.[10] Finding, as we do, that the toeboard is as integral a portion of a scaffold as any other part, to impose on Munson a duty to ascertain the safety of each part or section as he ascended, before trusting his weight to it, would create a precautionary requirement unreasonably burdensome, the hindering effect of which would far outweigh its advantages. Duval's foreman, being on the site that morning, as we find he was, was under the same obligation to inspect the scaffolding as he would have been had his own crew been working on the structure.

The non-conformance of the scaffolding to ordinary safety standards, the failure of Duval to make the wooden ladder accessible to Munson, and the failure of Duval's supervisor to inspect the scaffolding prior to CSM's use of it on the morning of August 5, present a cumulative picture of negligence on the part of defendant Duval from which liability under the Restatement is properly imposed.

Defendant Duval urges us to absolve all defendants of liability in any event because Munson was himself contributorily negligent. As a basis for this characterization, de-

[10] By saying that the *use* of the 2 x 4 was proper we are not, at this point, discussing any contributory negligence involved in his not inspecting it first. For resolution of that issue, see pp. 19–22 infra.

fendant sets out several ways in which Munson allegedly used less than ordinary care.

The most serious, and potentially fatal of these allegations, is that Munson was under a duty, both as supervisor of the CSM "crew" and as a workman experienced in the use of scaffolds, to physically inspect the structure before allowing any of his people, including himself, to go up on it. In Continental Can Company v. Horton, 250 F.2d 637 (8th Cir. 1957), the defendant argued that the injured plaintiff was negligent when he did not manually inspect each leg and locking ring of scaffolding which had been supplied by defendant. Plaintiff and his co-employees had not worked on the premises the three days immediately preceding the accident, although defendant's employees had. Plaintiff, the second person to ascend the scaffolding that day, was injured when one of the legs collapsed causing the structure to give way underneath him. In discussing plaintiff's particular failure to inspect before going up, the court said:

> There was not, as defendant contends, an open and patent danger and we do not think plaintiff's failure to manually check each leg of the scaffold before he mounted it was negligence under the circumstances. Indeed, there was nothing to indicate to him that an inspection . . . should be made. He saw the scaffold standing apparently secure and two men ascended upon it and descended. On this, and other evidence in the record, we cannot say that the plaintiff was guilty of contributory negligence as a matter of law . . . . 250 F.2d at 644.

In Continental Can it was considered significant that defendant had erected the scaffold the last time before it collapsed, and had retained control over it. The court quoted with approval from a Nebraska Supreme Court decision, Johnson v. Weborg, 142 Neb. 516, 7 N.W.2d 65 (1943), where it was said:

> [W]e hold that plaintiff had a right to rely upon the safe condition of the scaffold provided for him. In the ordinary course of things, such scaffolds do not collapse if proper care is used in their

construction and maintenance. The collapse of the scaffold affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose because the scaffold was not constructed in a safe, suitable and proper manner. Quoted at 250 F.2d at 644.

More to the point is Bjornson, Inc. v. Mid-Continental Casualty Co., 168 N.W.2d 677 (1969). In that case the court was satisfied by testimony tending to show that the alleged use as a "hand hold" of a 2 x 4 was customary and proper. It held, therefore, that plaintiff was not contributorily negligent in failing to test the strength of the "hand hold" before using it in the manner he did.

In Gregorius v. Safeway Steel Scaffolds Co., 409 Pa. 578, 187 A.2d 646 (1963), defendant, who supplied the scaffolding on which plaintiff painter was working when he fell, argued that plaintiff was barred from recovering because of his contributory negligence in using a concededly defective "pick" in a manner other than that for which it was intended. In rejecting defendant's argument the court said:

> In determining the standard of conduct of one who is injured in the performance of his employment, the work conditions and all of the circumstances incident thereto, including his obligation to do his job, must be considered. If in performing his employment, a workman conforms to the ordinary usage thereof, this is evidence of the exercise of due care and indicates lack of careless conduct . . . . "He knows he is occupying a place of great danger, and his care must be commensurate with that danger. He is equally cognizant of the fact that he must perform faithfully the services required of him. Both obligations are resting upon him, and each must be made with a due regard to the other." 187 A.2d at 649.

See also Walsh v. Miehle-Goss-Dexter, Inc., 378 F.2d 409, 414 (3rd Cir. 1967). And in Kempff v. B. E. King & Sons, 222 So.2d 921 (La. App. 1969), the court held that the plaintiff electrician was contributorily negligent when the first time he realized a plank did not properly span a hole was at the same time he walked on it and sustained his in-

639

juries. Just as in the instant case the loose toeboard could not be discovered until it was too late, the court there noted that "[the] condition was one which evidenced itself to those atop the scaffold only when they stepped on the board. Thus we can find no basis for finding the plaintiff contributorily negligent in this case." 222 So.2d at 925–26. See also Miller v. United States Steel Corporation, 299 F.2d 854 (3rd Cir. 1962), in which plaintiff, an experienced steel worker, was injured when he stepped on an upright girder. The evidence showed that it was customary in the trade to indicate that a girder was safe to walk on when it was left in an upright position. The court said "Defendant claims that plaintiff was guilty of contributory negligence in walking upon this beam as he did. But the plaintiff's testimony was that he, as an experienced and expert steel worker, was following the practice generally—perhaps universally —followed in his trade," and rejected the defense. 299 F.2d at 855. In a like manner, we do not feel that Munson should have been expected to ascertain the soundness of the 2 x 4 before grabbing it since, like the plaintiff in Miller, it was the custom in the trade to use toeboards as a hoist, and anyone erecting and maintaining a scaffold should have known that. As was stated in Reading Co. v. Pope & Talbot, Inc., 192 F.Supp. 663 (E.D. Pa. 1961), aff'd 295 F.2d 40 (3rd Cir. 1961),

The failure to anticipate negligence which results in an injury is not negligence and will not defeat an action for the injury sustained. A party is not bound to guard against the want of ordinary care on the part of another; he has a right to presume that ordinary care will be used to protect him and his property from injury. No one can complain of want of care in another where care is only rendered necessary by his own wrongful act. 192 F.Supp. at 667.

The other significant allegation as to Munson's contributory negligence goes to his failure to search for the wooden ladder and, without further thought, using the

built-in metal ladder to ascend the scaffold. Defendant argues that since plaintiff knew that the ladder had been supplied previously, he should have known it was on the premises somewhere, and should have gone in search of it before commencing his activities that day. Plaintiff counters this by asserting that although he had used the ladder the weekend before precisely because it made his job easier, in using the metal ladder the day of the accident he was nonetheless adhering to standards and practice acceptable in the trade.

One can only assume that the metal ladder was built into the scaffolding for practical rather than decorative reasons. Munson was free to choose his means of getting to the third tier platform, and just because he knew that one method was better than the other, does not make his choice of the latter contributory negligence.

Where a person, having a choice of two ways, one of which is perfectly safe, and the other of which is subject to risks and dangers, voluntarily chooses the latter and is injured, he is guilty of contributory negligence and cannot recover. Quinn v. Funk Bldg. Corp., 437 Pa. 268, 263 A.2d 458, 461 (1970). However, the so-called "choice of ways doctrine" applies only where the danger is so great and apparent that a person of ordinary prudence would not have used the way under the circumstances. City of Mitchell v. Stevensen, 201 N.E.2d 58 (Ind. App. 1964). In Andersen v. Orscheln Bros. Truck Lines, Inc., 393 S.W.2d 452 (Mo. 1965), contributory negligence was alleged against a plaintiff who, in attempting to climb up onto the platform of the dock to unload his employer's trailer, threw himself on the dock by "vaulting, jumping or climbing up on the equipment on the dock" rather than using the steps at the end of the dock. The plaintiff and his witnesses had testified that they used this means of access all the time, and even had the employer provided steel steps or pipe ladders with handrails, they doubted they would have used them. The court

rejected the contributory negligence argument of the defendant, saying:

> There was no evidence that there was danger involved or that [plaintiff] was aware of any danger inherent in this method, or that in following [it] he was taking any risk . . . . 393 S.W.2d at 459.

Moreover, it was not the use per se of the built-in ladder which caused the accident, but the faulty toeboard. Had the 2 x 4 been properly fastened, as plaintiff from his experience anticipated, his safe access to the third level of the scaffold would have been accomplished unimpeded. As the court said in Andersen,

> [Plaintiff] fell not because of the dangers inherent in the method of ascent adopted, but because of the sudden appearance of the oxygen cylinder flying in his face in midair. Certainly he had no reason to suspect that in mounting the dock in his customary way he would suddenly be confronted with the danger of being struck by an oxygen cylinder appearing out of nowhere. 393 S.W.2d at 459.

Although in hindsight Munson no doubt would have been better off had he taken the time to look for the wooden ladder, his failure to do so does not amount to such a disregard of care as to constitute contributory negligence. He still possessed, and used, an alternative means of mounting the scaffold which not only was well within acceptable practice in the trade, but which use also did not even qualify as the proximate cause of his injury. Similarly, his failure to test the solidity of the toeboard cannot be deemed contributory negligence, because his years of experience had led him to expect it, as a standard element of the structure, to bear his weight, and with his mind intent on the job to be done, it would be practically unfeasible to require him to inspect its safety before use.

Defendant has also offered, as a theory of Munson's contributory negligence, the fact that on the day of the accident Munson had a "crew" of only two men working on the site, whereas it claims that standard and safe procedure re-

quires at least three. Defendant argues that had there been a third person there to hold the hose, Jones would not have needed to throw it over the top of the scaffolding, and therefore Munson would not have had to go up to unsnag it. It attempts to bolster this argument by pointing out that both Munson and Jones were salaried employees, as opposed to the men who had been there the weekend before, who were paid by the hour. The significance of this is the explicit suggestion that by using only two men on the day of the accident, and salaried employees at that, CSM was attempting to cut corners, by avoiding the necessity of paying overtime wages to regular employees for working on a Saturday.

There is no evidence in the record that CSM cut corners anywhere, or that it did less than the workmanlike job it had contracted to do. Moreover, there was ample testimony, from all persons save Duval, hardly a disinterested witness, that it was not unusual or lacking in due care to utilize a two-member crew. We do not agree with defendant that such behavior on the part of Munson, or CSM (to whom it ultimately would have to be imputed), constituted contributory negligence.

Finding no contributory negligence on the part of the plaintiff, defendant Duval's liability under the preceding Restatement sections stands firm and undiluted.[11]

▮ Duval has joined Munson's employer, CSM, as a third-party defendant, and seeks indemnification against it for any sums which it is found to owe plaintiff. The gist of its claim seems to be that it is an action in contract rather than tort, arising out of the contract between CSM and Duval Construction Company, and that it accrues from

---

[11] Plaintiff has invited us to judicially abolish contributory negligence as a defense for all pending actions which are beyond the scope of Act No. 3382 which was passed by the Virgin Islands Legislature February 15, 1973, prospectively abolishing the doctrine. We decline to do so for many reasons, none of which need be developed here, as I have concluded that plaintiff Munson was not contributorily negligent.

CSM's non-delegable duty to inspect the premises to ensure the safety of its own employees. In essence what the argument really boils down to is that any money defendant is found to owe Munson because of his fall, due to Duval's inadequate maintenance of the scaffold, should be repaid by CSM because Munson, as CSM's supervisor on the job, failed to properly inspect the scaffold. The inherent contradiction in this proposition is obvious. No amount of semantic maneuvering by defendant, by calling the action one in contract rather than tort, can make Munson's behavior previously held to have met the standard of due care, a breach of CSM's duty.

Defendant cites Restatement of Agency 2d Section 502[12] as support for his claim. That section, however, as explained in the comments, refers to structures or instrumentalities which are "acquired from others by sale, lease or borrowing. In none of the comments or illustrations is there an example of an instrumentality supplied, controlled and negligently maintained by the party who was seeking indemnification. Although it is not so specified, it would seem that Sections 502 et seq. relate only to instrumentalities which pass into the custody and *control* of the master.

Moreover, even if the non-delegable duty provided in that Section is applicable under these circumstances, I am not persuaded that such duty has been breached. Duval asserts that Munson admitted he had not inspected the premises before Jones went up on the scaffold. This assertion is incorrect. Although Munson conceded that he had not specifically checked the 2 x 4 before he grabbed it, he did say

---

[12] The text of that section is as follows:
§ 502. A master who uses in his business a completed structure, instrumentality, or materials not made by his servants:
(a) is subject to liability for harm caused to his servants by a failure to use reasonable care in the purchase or inspection thereof;
(b) is not subject to liability for harm caused to his servants by unknown defects due to negligence in manufacture or upkeep prior to the time of purchase which reasonable care in the acquisition or inspection thereof would not reveal.

that he had "inspected the structure from the ground level" before starting the day's work. Only Munson testified at trial as to how thorough an inspection must be in order to be adequate, and he obviously justified his examination as sufficient. I think that most of the cases which support the absence of Munson's contributory negligence also support the proposition that his ground floor inspection was sufficient to satisfy CSM's alleged duty, and that it is unlikely that he should have had the burden of manually testing every possible hidden weakness before starting work. See especially Continental Can Company v. Horton; Bjornson v. Mid-Continental Casualty Co.; Miller v. United States Steel Corp., supra.

As I have already found Munson qua injured laborer to be totally without contributory negligence, I cannot now find that his identical behavior qua "master" of himself constituted the breach of a non-delegable duty of inspection. Although the scaffold in question was, in the terms of the Restatement section, "used in his business," I do not believe the exact factual situation presented here was within the contemplated scope of the Commentators. As I find that there was neither a non-delegable duty, nor a breach thereof, Duval's third-party complaint against CSM must be dismissed.

We come now to the matter of damages. As a direct result of the fall, Munson suffered broken heel bones of both feet, and a fracture of the left tibia (lower leg), all of which injuries were described by the testifying doctors as excruciatingly painful. During the course of hospitalization and thus far in his recovery, plaintiff has been treated by three doctors: Doctors Poblette, Carnes and MacDonald, the last two of whom are orthopedic surgeons. Although some corrective surgery was done prior to trial, Dr. Carnes concluded that further surgical treatment would ultimately

be necessary at some time within the next five years,[13] and further, that said surgery would result in the loss of flexion (flexibility) to plaintiff's left foot at the ankle joint. He also voiced the opinion that surgery on the right heel (fusion) would lessen Munson's extreme pain. Plaintiff already walks with a limp, attributable to the accident, and he has expressed a painful and frustrating inability to stand on his feet for any great length of time. He claims that this disability makes it virtually impossible to work any longer at a job such as sandblasting or painting, which requires climbing scaffolds or remaining long on his feet.

Plaintiff is clearly entitled to his loss of earnings from the date of the accident until June 1973, when he was able to go to work again. This compensation should be at the rate of $400 per week, as that is what he was making with CSM, a total of $4,000.

Munson is also entitled to an appreciable sum for past, present and future pain and suffering, and loss of enjoyment. As noted above, the particular injuries which plaintiff sustained tend to be highly painful, as testified to both by him and his doctors. Moreover, as a direct result of his fall he has developed the condition of traumatic arthritis, a condition which is not only painful, but hinders his movement as well, and is of a permanent and progressively degenerative nature.

Munson testified that prior to his accident he had derived great enjoyment from boating (he owned his own boat), bowling and golf. Although it appears that he had only recently taken up this last sport just prior to the accident, he had enjoyed it enough to invest a substantial amount in equipment. He also observed that he could no longer dance with his wife, who very much enjoyed that past-time, and

---

[13] No evidence of any kind was submitted as to the anticipated cost of the proposed surgery, and we are therefore unable to make any award for the future expense which inevitably will be incurred. The arrival by the Court at any likely sum would be pure speculation and entirely improper.

that he was uncomfortable going to the movies because the air conditioning so affected his joints. Moreover, he asserted that he could no longer visit his parents, who live in upstate New York, because the cold weather increased his pain to an almost intolerable degree.

In addition to being less able to enjoy these pastimes than he had before, it is apparent from the testimony that, because of his almost constant pain and discomfort, plaintiff's lifestyle has undergone a significant change. At one point he related to the Court how he now comes home from work in the evening and "takes a few bufferin, has a drink and dinner, and then goes to bed." Although it has not clearly emerged that Munson had formerly been an excessively energetic man, there can be no doubt that his enjoyment of life has diminished considerably as a result of his injuries.

In Gowdy v. United States, 271 F.Supp. 733 (W.D. Mich. 1967), rev'd 412 F.2d 525, cert. den. 396 U.S. 960, the plaintiff, who had been a journeyman electrician, after the accident could no longer engage in any activity which included prolonged standing or climbing. There, for injuries and inability to do work approaching, approximately those in the case at bar, the court awarded the plaintiff $130 per week pain and suffering for the first two years after the accident, and $100 a week after that until trial and the remainder of his life expectancy. In the area of loss of enjoyment, he was awarded $60 a week from injury to trial, and $25 a week for the period of his life expectancy. Other courts too have utilized a so much per week formula in measuring elements of damage. We elect to follow that lead, finding it no less flawless, or more fallible than other methods considered and used with approval.

Munson at the time of the accident was 39.74 years old, with an anticipated life expectancy of 26.33 years. At the date of the trial, his life expectancy was 23.87 years. We

think that for past pain and suffering a sum of $150 per week, from the date of injury to the time he first went back to work, (ten weeks) is appropriate. We are also of the opinion that for past, present and future pain and suffering, $125 per week, is a proper sum, running from the date of return to work to trial and thereafter for 23.87 years, discounted where required, to present value. Although for the purpose of evaluating the item of damage we have gauged it by a weekly amount, in reducing a gross figure to present day value, we have, in each instance, done so on the basis of a quarterly money flow, discounted at six (6%) per cent. Reduced to present value, as mentioned, this item of damage amounts to $82,187.62. Not discounted are the $1500 allowed for the first ten weeks, and the $14,740 herein allowed to the time of trial.[14]

For loss of enjoyment of life, which includes a frustrating change of lifestyle, we award $50 per week, to run from the date of injury, discounting only the portion allocable to the period running from trial date to end of life expectancy. The discounted portion of this item is $32,875.05. For the period from injury to trial plaintiff will be awarded $6,396.

Plaintiff has submitted a claim for the alleged impairment to his earning capacity, citing as justification the fact that he can no longer ply his trade as a painter or sandblaster because of his inability to climb or work on scaffolds, thus leaving him only the alternative of working in a supervisory position.

There was testimony that subsequent to his initial recovery, Munson worked at various jobs as a painter, in some attempting to use scaffolds, in others not. His construction supervisor on one of these jobs, William Houtz, testified as to plaintiff's job efficiency. Houtz testified that at the time he hired Munson to do painting at a local con-

---

[14] All sums awarded for future pain and suffering, and loss of enjoyment of life, are to be discounted to present value.

dominium, Gentle Winds, in the late summer of 1973, he had not known about his injuries, and that Munson's duties included climbing scaffolds in order to execute the painting work. Houtz said that Munson had been unable to put in a full day's work because of pain and swelling of his feet and joints, and that he was usually forced to quit after working a mere four or five hours. He added that, from the standpoint of efficiency, he would not be willing to hire him again.

In rebuttal to this, defendant submitted Exhibit F, which was a time sheet of CSM employees. It shows that during the period from October 24, through December 16, 1973, Munson averaged from six to nine hours of work each day, the vast majority of those days exceeding seven hours.

In terms of job opportunities which do not encompass scaffold climbing and prolonged hours on his feet, Munson noted that he felt himself well qualified to teach telephone installation. Indeed, he had at one point after his accident been hired and gone to Florida to do just that, but returned to St. Croix because the "school" was not yet ready to begin activities. Munson also admits that he would be able to take on painting supervision, or any other job in his area which would require him to do no more than sit at a desk. He claims that the alternative job opportunities suitable to a man of his training and work habits are quite rare in this area, and that he is loathe to leave because he and his wife own their home. He conceded that there are perhaps two telephone training jobs existent in the Virgin Islands, but that as of the time of the trial, he had not sought them because there were no vacancies.

Plaintiff is currently employed by Litwin Corporation at a desk job for a salary of $1700 per month. This job will cease in July, however, when the corporation finishes its work here on the island and returns stateside.

Plaintiff's economic expert George Benz, illustrated three methods of measuring the percentage of Munson's lost earning capacity. For this purpose he calculated plaintiff's prospective earnings in his primary occupation (painting and sandblasting), a secondary occupation (supervisory capacity), and finally on the bare basis of the national minimum wage. Despite all this, the witness was not able to isolate from Munson's salary from CSM that part which was directly earned qua painter and sandblaster, and that part earned as an officer of that corporation. Moreover, on cross-examination he conceded that he really was not aware of what kind of job opportunities were available in the Virgin Islands for a man of Munson's talents.

Although it is clear to us that Munson is genuinely disabled, the work sheets showing his work hours in excess of seven per day, for work that included climbing scaffolding, cause us to question whether he is entirely prevented from returning to the type of work he did before. Even assuming that such work, while possible, is rendered agonizing by the pain involved, the figures before us convincingly point to the conclusion that, in a supervisory job, Munson is now making more per week that he was before the accident.

As an officer of CSM Munson will still earn whatever profits he otherwise would. As a workman, it is obvious that he is still capable of making a living equal to, if not beyond that which he was making before. We are not in a position to say that supervisory positions abound, but there was testimony that they do exist,[15] and that Munson is qualified to fill them. From the evidence before us, we must believe that Munson is in pain and will never again be able to fully enjoy life as he did before. For this he will be appropriately compensated. But none of the economist's deft calculations has solidly demonstrated that Munson's earn-

---

[15] The same may be said of sandblasting and painting on the large scale that would return Munson remuneration on the order he seeks.

ing capacity has diminished significantly. Only his ability to work on scaffolds, and on his feet, has been lessened, not his capacity to make as much money as he did before. His present employment amply shows this. We can appreciate the fact that were he still able to do that kind of work his flexibility on the job market would be greater, but it has been shown too well that he is not entirely dependent on that line of work to make a living. Our decision in this regard is not so much intended to say that Munson will always earn what he was receiving at the time of his fall, as to say that the proof failed to establish that, his talents and availability of job opportunities considered, it is more probable than not that he would earn less by reason of the accident, and the injuries suffered as a consequence thereof. For these reasons, we are unable to award him recovery for loss of earning capacity.

Plaintiff is entitled to an award of damages in the total sum of $141,698.67. Let judgment enter accordingly.

### MEMORANDUM ON MOTION TO RECONSIDER

Judgment in this personal injury action was entered on April 29, 1975, pursuant to a Memorandum Opinion of April 15, 1975. Plaintiff has filed a motion under Rule 59, F.R.C.P., urging the Court to reconsider its assessment and valuation of certain items of damages. Specifically, plaintiff contends that the Court erred as a matter of law in reducing to present value the awards for future pain, suffering and loss of enjoyment. We disagree, and stand by the judgment previously entered. Because of the widespread controversy surrounding this issue, however, we feel it appropriate to explain at some length our reasons for denying plaintiff's motion.

There appears to be conflict throughout both federal and state jurisdictions as to the propriety and, indeed, the necessity of reducing awards for future pain and suffering. We

recognize that the great weight of authority is against such a reduction, Anno., 60 A.L.R.2d 1347, 1352–53 (1958); Anno., 77 A.L.R. 1439, 1451–53 (1932); Anno., 28 A.L.R. 1177, 1178–81 (1922); 25 C.J.S. Damages Section 94; Am.Jur.2d Damages Section 108. Indeed, the balance has so far tipped that the new jury instructions in Devitt and Blackmar have specifically excluded this item. In the Notes following Instruction 78.13, the editors observe that "the instruction in the initial edition has been modified to exclude a requirement of reduction of damages for 'future pain and suffering,' on the ground that such a requirement is not a part of the law of most states." 2 Devitt and Blackmar, Federal Jury Practice and Instructions Section 78.13 (2d ed. 1970) (p. 207).

Nonetheless, we have what we believe to be two sound reasons for holding against that authority, at least in the case presently before us. First of these is the fact that in all but a very few jurisdictions, the choice whether or not to reduce to present value appears to be couched in discretionary terms. Thus, the judicial pronouncements almost without fail provide that "(t)he sum of money a jury awards for pain and suffering . . . *need not be reduced to its present worth.*" Schirra v. Delaware, L. & W.R. Co., 103 F.Supp. 812, 823 (M.D. Pa. 1952) (emphasis supplied). See also, for the exact same phraseology, Yodice v. Koninklijke Nederlandsche Stoom. Maat, 443 F.2d 76, 77 (2nd Cir. 1971); Restatement (Second) of Torts, comment a at 128 (Tent. Draft No. 19, 1973). Contra, Taylor v. Denver and Rio Grande Western Railroad Co., 438 F.2d 351 (10th Cir. 1971), in which the appeals court held that it was reversible error to reduce future pain and suffering to present worth.

Apart from what we view as the discretionary character of the rule, we further distinguish the instant

case by the form of our award, and its relationship to the theory underlying the refusal of most courts to reduce.

█ The award presently under consideration was made on the basis of a given amount per week. As we noted in the Memorandum Opinion (p. 646, 647), and reaffirm here, such a methodology is neither unheard of nor rare. Most courts which have analyzed their refusal to reduce future pain and suffering to present worth have justified their action along the same lines as those adopted in Chicago and N.W. Ray Co. v. Chandler, 283 F. 881 (8th Cir. 1922). The excellent rationale of that opinion justifies the lengthy quotation therefrom, as follows:

> In the matter of pain, suffering, or inconvenience, no books are kept, no inventories made, no balance is struck. Neither the plaintiff in the case, nor anyone else in the world, has ever established a standard of value of these ills . . . . At the best the allowance is an estimated sum determined by the intelligence and conscience of the jury, and we are convinced that a jury would be much more likely to return a just verdict, considering the estimated life as one single period, than if it should attempt to reach a verdict by dividing the life into yearly periods, setting down yearly estimates, and then reducing the estimates to their present value.

See also Taylor v. Denver and Rio Grande Western Railroad Co., supra. We understand the reasoning underlying these decisions to be that, since an item such as pain and suffering cannot be broken down into quantifiable units of so much money per time period, there is really no basis on which to reduce it to present worth. A distinction is often made between this kind of injury and something concrete such as loss of future earnings, which is susceptible to yearly measurement. "The present value rule as to future pecuniary loss (i.e., future earnings) is acceptable because the jury, from evidence received, can determine with reasonable certainty the amount to be earned during each year of the estimated life . . . ." Id., at 352. As we have arrived at

an amount certain for a measurable yearly period, we believe that the award is therefore susceptible to reduction to present value. The decision in Yodice v. Koninklijke Nederlandsche Stoom. Maat, supra, seems to accord with this reasoning, as the court there said that "(a)n award for pain and suffering need not be discounted *when it is in the form of a lump sum.*" 443 F.2d at 77 (emphasis supplied). In plain words, we are of the opinion that because our award was *not* in the form of a lump sum, reduction was properly within the court's discretion.

We note that although many of the circuits have taken a firm position on this issue one way or the other, Taylor v. Denver and Rio Grande Western Railroad Co., (10th Cir.) supra; Texas and Pacific Ry. Co. v. Buckles, 232 F.2d 257 (5th Cir. 1956), cert. den. 76 S.Ct. 1052; Petition of United States Steel Corp., 436 F.2d 1256 (6th Cir. 1970), cert. den. 402 U.S. 987, reh. den. 403 U.S. 924, appeal after remand 479 F.2d 489 cert. den. 414 U.S. 859, no such guideline has been offered by our circuit, although there have been cases decided in accordance with plaintiff's theory by district courts within the circuit. See, e.g., Hanson v. Reiss Steamship Company, 184 F.Supp. 545 (D. Del. 1960); Schirra v. Delaware, L.W.R. Co., 103 F.Supp. 812 (M.D. Pa. 1952). Plaintiff argues that the circuit court's affirmance of the unreduced award in Frankel v. Heym, 466 F.2d 1226 (3rd Cir. 1972) represents just such a holding, but we do not believe that it can be so construed. For one thing, Judge Hastie did not even address the issue of reduction, and held only that the award of $650,000 was not excessive. There is no way of knowing whether the question of reduction was even before the court. Moreover, we note that the award in Frankel was in the form of a lump sum, and thus would come under the distinction which we perceive under Yodice.

We therefore conclude, in the absence of an explicit directive from the circuit court, that (a) an award for pain and suffering such as we made, broken down into a specific amount per time period, is proper; and that (b) when damages for pain and suffering are awarded in that manner, as distinguished from a lump sum, it is not improper to reduce that award to present value.

In accordance with views expressed above, plaintiff's motion is denied.